**UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF COLUMBIA**

STATE OF NEW YORK,
by LETITIA JAMES, Attorney General of the
State of New York
28 Liberty Street
New York, NY 10005;

STATE OF NEW JERSEY,
by JENNIFER DAVENPORT, Attorney General of
the State of New Jersey
25 Market Street
Trenton, NJ 08625;

STATE OF CONNECTICUT
by WILLIAM TONG, Attorney General of the
State of Connecticut
165 Capitol Avenue
Hartford, CT 06106;

STATE OF MAINE,
by AARON M. FREY, Attorney General of the
State of Maine
6 State House Station
Augusta, ME 04330;

COMMONWEALTH OF MASSACHUSETTS,
by ANDREA JOY CAMPBELL, Attorney General
of the Commonwealth of Massachusetts
1 Ashburton Place
Boston, MA 02108;

STATE OF RHODE ISLAND,
by PETER F. NERONHA, Attorney General of the
State of Rhode Island
150 South Maine Street
Providence, RI 02903; and

STATE OF VERMONT,
by CHARITY R. CLARK, Attorney General of the
State of Vermont
109 State Street
Montpelier, VT 05609,

       Plaintiffs,

C.A. No. 26-1910

**AMENDED COMPLAINT
FOR DECLARATORY
AND INJUNCTIVE
RELIEF**

v.

U.S. DEPARTMENT OF THE INTERIOR
1849 C Street, NW
Washington, DC 20240;

DOUGLAS J. BURGUM, in his official capacity as
Secretary of the U.S. Department of the Interior
1849 C Street, NW
Washington, DC 20240;

BUREAU OF OCEAN ENERGY MANAGEMENT
1849 C Street, NW
Washington, DC 20240;

MATTHEW GIACONA, in his official capacity as
Acting Director of the Bureau of Ocean Energy
Management
1849 C Street, NW
Washington, DC 20240;

U.S. DEPARTMENT OF JUSTICE
950 Pennsylvania Avenue, NW
Washington, DC 20530;

TODD BLANCHE, in his official capacity as
Attorney General
950 Pennsylvania Avenue, NW
Washington, DC 20530; and

ATTENTIVE ENERGY LLC, as an interested
party
1201 Louisiana Street, Suite 1800
Houston, TX 77002,

        Defendants.

Plaintiffs the State of New York, by its attorney Letitia James, Attorney

General of the State of New York; the State of New Jersey, by its attorney Jennifer

Davenport, Attorney General of the State of New Jersey; the State of Connecticut, by

its attorney William Tong, Attorney General of the State of Connecticut; the State of

Maine, by its attorney Aaron M. Frey, Attorney General of the State of Maine; the

2

Commonwealth of Massachusetts, by its attorney Andrea Joy Campbell, Attorney General of the Commonwealth of Massachusetts; the State of Rhode Island, by its attorney Peter F. Neronha, Attorney General of the State of Rhode Island; and the State of Vermont, by its attorney Charity R. Clark, Attorney General of the State of Vermont (together, the States), as and for their complaint, allege as follows, upon information and belief, against defendants the U.S. Department of the Interior (Interior); Douglas Burgum, Secretary of the Interior (the Interior Secretary), in his official capacity; the Bureau of Ocean Energy Management (BOEM); Matthew Giacona, Acting Director of BOEM, in his official capacity (together with previously listed defendants, Interior Defendants); the U.S. Department of Justice (DOJ); Todd Blanche, Attorney General, in his official capacity (together with all previously listed defendants, Federal Defendants); and Attentive Energy LLC (Attentive), as an interested party:

## INTRODUCTION

1.    The States bring this action to challenge, declare unlawful, and enjoin Federal Defendants' cancellation of offshore wind lease number OCS-A 0538 (the Lease) and execution and implementation of the associated "settlement agreement" (the Settlement Agreement[1]) between the United States, acting through Interior, and Attentive, a subsidiary of TotalEnergies SE (together with its subsidiaries and affiliates, TotalEnergies), which held the Lease.

---

[1] Even though the Settlement Agreement is not a compromise settlement agreement reached by adverse parties, Federal Defendants refer to it as such, so the States will use the term "Settlement Agreement" to avoid confusion.

2.      The Lease, which Attentive acquired at a competitive lease sale in 2022, comprised over 84,000 acres in the New York Bight, a large, shallow region of ocean between Long Island and the New Jersey coast. Wind turbines in the Lease area would have provided electricity to both New York and New Jersey and were anticipated to have a nameplate capacity (maximum power output) of more than 2.7 gigawatts, enough to power over 1.3 million New York and New Jersey homes. Because the Lease area is in the New York Bight, wind energy generated there would have been expected to serve New York City, which is in significant need of additional electricity.

3.      New York and New Jersey have relied on the development of the Lease area as a component of their respective long-term strategies to support grid reliability, energy diversification, and climate goals. The Lease was crucial to the two States because the addition of offshore wind generation to their energy mix will help to ensure that there is adequate electricity to meet growing demand and that the two States receive electricity from a diverse range of sources, thereby helping to ensure the reliability of their grids and also helping them to meet their statutory climate goals.

4.      Offshore wind has been a major part of New York's long-term energy planning for many years, dating back to studies initiated by the New York State Energy Research and Development Authority (NYSERDA) over a decade ago.

5.     In 2018, New York's Public Service Commission adopted an "Offshore Wind Standard" calling for the procurement of offshore wind energy generation to serve New York's electricity needs.

6.     Also in 2018, after two years of in-depth research, analysis, and outreach, New York issued an Offshore Wind Master Plan, which explained that "[t]he development of offshore wind energy . . . will stimulate the State's economy, support revitalization of maritime communities, spur infrastructure investment, and help create a new American industry centered in New York State that will create thousands of new jobs for skilled workers."[2]

7.     In 2019, the New York Legislature passed the Climate Leadership and Community Protection Act (the Climate Act), 2019 N.Y. Laws ch. 106 (codified in part at N.Y. Env't Conserv. Law §§ 75-0101 *et seq.*, § 54-1523; N.Y. Pub. Serv. Law § 66-p), declaring that "[c]limate change is adversely affecting economic well-being, public health, natural resources, and the environment of New York," *id.* § 1(1). To combat climate change, the Climate Act instituted numerous statewide clean energy targets, including the procurement of at least 9 gigawatts of electricity generated by offshore wind resources to serve New York by 2035.

8.     Pursuant to the energy planning process mandated by its Energy Law, New York released a 2025 State Energy Plan. The Plan finds that offshore wind is expected to make up a material component of new generation needed to meet New York's growing need for reliable, affordable, and clean energy.

---

[2] NYSERDA, Report No. 17-25, New York State Offshore Wind Master Plan 5 (2018).

9.     Similarly, New Jersey relied on the anticipated generation of offshore wind from the Lease in its energy resource planning, as well as in its 2024 Energy Master Plan. The goals and targets for offshore wind set forth in those plans and resource planning were part of the State's comprehensive framework to meet projected demand for electricity. New Jersey also expected that the Lease would help the State effectuate energy resource planning that took place in earlier years, such as the State's 2019 Energy Master Plan and 2020 Offshore Wind Strategic Plan.

10.    Pursuant to the Offshore Wind Economic Development Act, 2010 N.J. Laws ch. 57 (codified at N.J. Stat. Ann. §§ 48:3-51, -87 to -87.2, 26:2C-51, 34:1B-209.4), and the Global Warming Response Act, 2007 N.J. Laws ch. 112 (codified at N.J. Stat. Ann. §§ 26:2C-37 to -43, 48:3-87, 26:2C-44), New Jersey is required to meet statutory targets for wind and other sources of clean energy. The Attentive Energy Two Project to be developed on the Lease was expected to help the State meet those mandates.

11.    Offshore wind represents an important opportunity for New Jersey to reap the benefits of locally produced electricity—which it is well positioned to develop along its extensive shoreline—and was expected to bolster the State's economy and labor sector in addition to providing a reliable source of clean power.

12.    So, too, were other States slated to benefit from offshore wind, generally, and the development of this Lease area, specifically. For example, Connecticut, Maine, Massachusetts, Rhode Island, and Vermont (the New England States)

regularly import energy from New York through high-voltage interconnection to meet rising energy demand.

13. In addition, Renewable Portfolio Standards established by state law in the New England States require utilities and other suppliers of electricity to purchase renewable energy certificates/credits (RECs), market-based instruments that represent the environmental attributes associated with 1 megawatt-hour of electricity generated by a renewable resource. *See* Me. Stat. tit. 35-A, § 3210; Mass. Gen. Laws. ch. 25A, § 11F; 39 R.I. Gen. Laws § 39-26-4; Vt. Stat. Ann. tit. 30, § 8004. Electricity suppliers in the New England States can purchase RECs from renewable energy sources in New York, but if fewer New York RECs are available as a result of cancellation of offshore wind leases in New York, New England electricity suppliers will pay more for those RECs, which is likely to increase energy prices for ratepayers and could present an obstacle to the New England States meeting their Renewable Portfolio Standards.

14. BOEM awarded Attentive the Lease after years of analysis and extensive consultation with the Department of Defense (DOD)[3] to ensure that any resulting wind energy projects would appropriately mitigate all national security concerns.

---

[3] On September 5, 2025, President Trump issued an executive order seeking to change the name of this federal agency from the Department of Defense to the Department of War. Exec. Order No. 14347, 90 Fed. Reg. 43893 (Sept. 10, 2025). This complaint uses "Department of Defense" or "DOD."

15.    In January 2025, President Donald Trump was inaugurated, and his administration began taking a series of actions to prevent the continuing development of wind energy.

16.    On his first day in office, President Trump issued a memorandum halting all federal approvals for the development of wind energy and withdrawing all areas of the Outer Continental Shelf from consideration for wind energy leasing. In December 2025, a federal district court vacated federal agencies' implementation of the memorandum after determining that it was arbitrary, capricious, and contrary to law.

17.    In December 2025, BOEM Acting Director Giacona issued orders directing five offshore wind projects to "suspend all ongoing activities related to [projects] on the Outer Continental Shelf for the next 90 days for reasons of national security."[4] These suspension orders were purportedly based on unspecified "national security threats" identified in a classified assessment conducted by DOD.[5] In January and February 2026, federal district courts stayed or preliminarily enjoined all five suspension orders based on determinations that the classified information they reviewed *in camera* did not identify any imminent national security risk.

---

[4] BOEM, Acting Director's Orders to Suspend All Ongoing Activities, Issued to Equinor (Empire Leaseholder LLC), Orsted N. Am. Inc. (Revolution Wind LLC and Sunrise Wind LLC), Vineyard Wind 1 LLC, and Va. Elec. & Power Co. (OSW Project LLC) (Dec. 22, 2025), https://perma.cc/92E3-27XF.

[5] Decl. of Matthew Giacona ¶ 11, *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 25-cv-830 (E.D. Va. Dec. 27, 2025).

18. Over the past months, President Trump and Interior Secretary Burgum have made numerous anti-wind statements, including President Trump's declaration that "my goal is not to build any windmills in this country"[6] and Secretary Burgum's promise that, "[u]nder this administration, there is not a future for offshore wind."[7]

19. Consistent with the Trump Administration's opposition to wind energy, on March 23, 2026, more than four years after awarding Attentive the Lease, Interior announced that it had reached an agreement with TotalEnergies to terminate the Lease and reimburse the company up to $795 million, the amount Attentive paid for the Lease. Interior also stated that, "in light of the national security concerns, TotalEnergies has pledged not to develop any new offshore wind projects in the United States."[8]

20. Several weeks later, Interior published the terms of the Settlement Agreement. Per the executed Settlement Agreement, "the Department of War has raised classified national security concerns" that "would have prevented the lease

---

[6] Aaron Rupar (@atrupar), X (Jan. 9, 2026, at 4:10 PM), https://x.com/atrupar/status/2009734529045364757?s=46 [https://perma.cc/CAX7-M2T5].

[7] Spencer Kimball, *Offshore Wind Has No Future in the U.S. Under Trump Administration, Interior Secretary Says*, CNBC (Sept. 11, 2025, at 9:45 AM; updated 3:04 PM), https://www.cnbc.com/2025/09/11/offshore-wind-renewables-energy-trump-burgum.html?msockid=3e5ad34f0c9566c01293c5a60df76719.

[8] Press Release, Interior, Interior and TotalEnergies Agree to End Offshore Wind Projects, Lowering Costs for American Families (Mar. 23, 2026), https://www.doi.gov/pressreleases/interior-and-totalenergies-agree-end-offshore-wind-projects-lowering-costs-american.

issuance if they had been considered." Ex. 1, Settlement Agreement Between the U.S. & Attentive Energy, LLC (Mar. 23, 2026) (Settlement Agreement), at 2.

21.    The Settlement Agreement provides that TotalEnergies will invest $795 million in oil and gas development and covenant not to sue in exchange for Federal Defendants reimbursing Attentive $795 million and cancelling the Lease.

22.    In a letter dated April 17, 2026, Interior stated that TotalEnergies had made the $795 million investment contemplated by the Settlement Agreement and that Interior was thereby cancelling and rescinding the Lease. Ex. 2, Interior, Lease Cancellation Decision Letter Issued to Attentive Energy, LLC (Apr. 17, 2026) (Letter).

23.    The Attentive Lease cancellation should be held unlawful and set aside pursuant to the Administrative Procedure Act (the APA), 5 U.S.C. § 706(2)(A), (D), because it is arbitrary and capricious, is not in accordance with law, and occurred without observance of procedure as required by law.

24.    The Lease cancellation is arbitrary and capricious because Interior Defendants failed to (1) provide a reasoned explanation for cancelling the Lease; (2) explain their change in position or account for New York and New Jersey's reliance interests; (3) address alternative means of achieving their objectives; or (4) provide a genuine justification for their actions.

25.    The Lease cancellation also violates the APA because it is not in accordance with law and is without observance of procedure required by law, 5 U.S.C. § 706(2)(A), (D). The Lease cancellation violates the National Environmental Policy

10

Act (NEPA), 42 U.S.C. §§ 4321 *et seq.*, because it is a major federal action requiring Interior Defendants to consider the impacts of and alternatives to their action, which they failed to do.

26. The Lease cancellation also violates the Outer Continental Shelf Lands Act (OCSLA), 43 U.S.C. § 1349(a)(1), and the APA, 5 U.S.C. § 706(2)(A), (D), because it is not in accordance with OCSLA or the procedures OCSLA requires. Interior Defendants (1) did not hold a hearing before cancelling the Lease or make the required determination that cancellation was required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) did not suspend the Lease for a period of five years prior to cancellation, in violation of 43 U.S.C. § 1334(a)(2)(B); (3) paid Attentive more than the fair market value of the Lease, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (4) did not consider the factors they were required to consider under 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102 or otherwise demonstrate grounds for departure from regulations pursuant to 30 C.F.R. § 585.103; and (5) did not notify or coordinate with the Governors of the affected States, in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

27. The Settlement Agreement, which led to and is the but-for cause of the Lease cancellation, also violates OCSLA, 43 U.S.C. § 1349(a)(1), and is not in accordance with law within the meaning of the APA, 5 U.S.C. § 706(2)(A), because its terms violate OCSLA, *see supra* ¶ 26, and the Judgment Fund Act. The Settlement Agreement violates the Judgment Fund Act, 31 U.S.C. § 1304, because the $795 million promised to Attentive (1) is a type of payment otherwise provided for by law,

namely, OCSLA, and (2) is not the result of a compromise settlement between adverse parties, but rather an agreement resulting from Interior Defendants' pretextual national security concerns and TotalEnergies' desire to receive unauthorized compensation for an expensive offshore wind lease.

28.    Finally, the Settlement Agreement is in excess of statutory authority, 5 U.S.C. § 706(2)(C), and *ultra vires* because no statute authorizes Federal Defendants to use a sham settlement agreement to unlawfully cancel an offshore wind lease and redirect the money paid for the lease to a separate, unauthorized use favored by the President.

29.    The States seek an order: (1) declaring that the Lease cancellation and Settlement Agreement violate the APA, NEPA, OCSLA, and the Judgment Fund Act; (2) compelling compliance with OCSLA; (3) vacating and setting aside the Lease cancellation and Settlement Agreement; (4) enjoining Federal Defendants from taking further action with respect to the Lease cancellation and Settlement Agreement; and (5) granting such further relief as the Court deems just and proper, including, but not limited to, attorneys' fees and costs.

## PARTIES

30.    Plaintiff State of New York is a sovereign State in the United States of America and is represented by Attorney General Letitia James, who is the chief law enforcement officer of New York.

12

31.    Plaintiff State of New Jersey is a sovereign State in the United States of America and is represented by Attorney General Jennifer Davenport, who is the chief law enforcement officer of New Jersey.

32.    Plaintiff State of Connecticut is a sovereign State in the United States of America and is represented by and through its chief legal officer, Attorney General William Tong, who is authorized under Connecticut General Statutes § 3-125 to pursue this action on behalf of the State of Connecticut.

33.    Plaintiff State of Maine is a sovereign State in the United States of America and is represented by Attorney General Aaron M. Frey, who is the chief law enforcement officer of Maine.

34.    Plaintiff Commonwealth of Massachusetts is a sovereign State in the United States of America and is represented by Attorney General Andrea Joy Campbell, who is the chief law enforcement officer of Massachusetts.

35.    Plaintiff State of Rhode Island is a sovereign State in the United States of America and is represented by Attorney General Peter F. Neronha, who is the chief law enforcement officer of Rhode Island.

36.    Plaintiff State of Vermont is a sovereign State in the United States of America and is represented by Attorney General Charity R. Clark, who is the chief law enforcement officer of Vermont.

37.    Defendant Interior is a cabinet agency within the executive branch of the United States government. Interior has responsibility over leasing, permitting,

construction, and operation of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA and its implementing regulations.

38.    Defendant Douglas Burgum is the Interior Secretary and Interior's highest-ranking official. He is sued in his official capacity. Interior Secretary Burgum is the federal official ultimately responsible for the management and oversight of leasing, permitting, construction, and operation of offshore wind projects on the Outer Continental Shelf pursuant to OCSLA and for all official actions or inactions of Interior and BOEM challenged in this action.

39.    Defendant BOEM is a bureau within Interior. BOEM is responsible for the administration, leasing, and permitting of offshore energy projects on the Outer Continental Shelf pursuant to OCSLA.

40.    Defendant Matthew Giacona is the Acting Director of BOEM and BOEM's highest-ranking official. He is sued in his official capacity.

41.    Defendant DOJ is a cabinet agency within the executive branch of the U.S. government. DOJ possesses litigation and settlement authority on behalf of Interior and, consequently, is responsible for submitting Judgment Fund requests on Interior's behalf.

42.    Defendant Todd Blanche is Attorney General and DOJ's highest-ranking official. He is sued in his official capacity.

43.    Defendant Attentive is a limited liability company that held the Lease.

## JURISDICTION AND VENUE

44.    This Court has subject matter jurisdiction over this case because it arises under the laws of the United States, *see* 28 U.S.C. § 1331, namely, the APA, 5

14

U.S.C. § 706, OCSLA, 43 U.S.C. §1349, NEPA, 42 U.S.C. §§ 4321 *et seq.*, and the Judgment Fund Act, 31 U.S.C. § 1304. The Court also has jurisdiction under the citizen suit provision of OCSLA, 43 U.S.C. § 1349.

45.    Venue is proper in this district pursuant to 28 U.S.C. § 1391(b)(2) and (e)(1) and 43 U.S.C. § 1349(b)(1). Federal Defendants are United States officers and agencies sued in their official capacities, and they perform their official duties in the District of Columbia. A substantial part of the events or omissions giving rise to this complaint occurred and continues to occur within the District of Columbia.

46.    The Court has personal jurisdiction over Attentive under D.C. Code § 13-423(a)(1) because the States' claims arise from business that Attentive transacted in the District of Columbia, including bidding for the Lease in an auction held by BOEM, entering into a lease agreement with BOEM, and negotiating and entering into the Settlement Agreement with Interior that directed the Lease's cancellation.

<strong>LEGAL BACKGROUND</strong>

## I.    The Outer Continental Shelf Lands Act

47.    OCSLA states that the Outer Continental Shelf is "a vital national resource reserve held by the Federal Government for the public" and asserts that "the rights and responsibilities of all States . . . to preserve and protect their marine, human, and coastal environments through such means as regulation of land, air, and water uses, of safety, and of related development and activity should be considered and recognized." 43 U.S.C. § 1332(3), (5). The law directs the Interior Secretary to

15

facilitate its "expeditious and orderly development" while maintaining competition and environmental safeguards. *Id.* § 1332(3).

48.    In 2005, Congress amended OCSLA to authorize the Interior Secretary to issue leases on the Outer Continental Shelf for renewable energy production.[9] In doing so, Congress sought to "enhance the energy security of the United States," "decrease dependance on foreign sources of fuel," S. Rep. No. 109-78, at 1 (2005), and "ensure jobs for our future with secure and reliable energy," H.R. Rep. No. 109-215, at 1 (2005).

49.    To those ends, OCSLA provides detailed requirements for leasing and developing Outer Continental Shelf lands, including, as relevant here, specific procedures that must be followed to cancel or relinquish a lease.

50.    Pursuant to OCSLA, the Interior Secretary, in consultation with relevant federal agencies, may "grant a lease, easement, or right of way" for activities that "produce or support production, transportation, storage, or transmission of energy sources other than oil and gas," including offshore wind. 43 U.S.C. §§ 1337(p)(1)(C), 1356c. The Interior Secretary "shall ensure that any activity" authorized "is carried out in a manner that provides for" twelve enumerated factors, including safety, protection of the environment, prevention of waste, protection of national security interests of the United States, and prevention of interference with other reasonable uses of the Outer Continental Shelf. *Id.* § 1337(p)(4). The Interior

---

[9] *See* Energy Policy Act of 2005, Pub. L. No. 109-58, § 388, 119 Stat. 594, 744–47 (2005).

Secretary shall also "provide for the duration, issuance, transfer, renewal, suspension, and cancellation of a lease," *id.* § 1337(p)(5), "shall provide for coordination and consultation with the Governor of any State . . . that may be affected by a lease" under OCSLA's offshore wind leasing provision, *id.* § 1337(p)(7), and shall "notify the Governor of any . . . State" affected by a federal action "which has a direct and significant effect on the outer Continental Shelf or its development," *id.* § 1334(h).

51.    Under OCSLA, the Interior Secretary may cancel a lease only after determining, "after a hearing," that:

(i)    continued activity pursuant to such lease . . . would probably cause serious harm or damage to life (including fish and other aquatic life), to property, to any mineral (in areas leased or not leased), to the national security or defense, or to the marine, coastal or human environment;

(ii)    the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time; and

(iii)    the advantages of cancellation outweigh the advantages of continuing such lease . . . .

*Id.* § 1334(a)(2)(A).

52.    OCSLA provides that a lease cancellation generally "shall not occur unless and until operations under such lease or permit have been under suspension" for a period of five years. *Id.* § 1334(a)(2)(B).

53.    OCSLA provides that a lease cancellation entitles the lessee to receive compensation. *Id.* § 1334(a)(2)(C). The lessee may be compensated with "the lesser of" the following:

17

(i)    the fair value of the canceled rights as of the date of cancellation, taking account of both anticipated revenues from the lease and anticipated costs, including costs of compliance with all applicable regulations and operating orders, liability for cleanup costs or damages, . . . and all other costs reasonably anticipated on the lease, or

(ii)    the excess, if any, over the lessee's revenues, from the lease (plus interest . . . ) of all consideration paid for the lease and all direct expenditures made by the lessee after the date of issuance of such lease and in connection with exploration or development, or both, pursuant to the lease[.]

*Id.*

54.    OCSLA also directs the Interior Secretary to prescribe regulations "for the assignment or relinquishment of a lease." *Id.* § 1334(a)(3); *see* 30 C.F.R. § 585.435. A lessee may "surrender a lease . . . by filing with BOEM a properly completed official relinquishment form." 30 C.F.R. § 585.435(a). Relinquishing a lease does not absolve the lessee of the obligation to "[m]ake all payments due on the lease[,] . . . including any accrued rent and deferred bonuses." *Id.* § 585.435(a)(1). OCSLA also does not provide for any compensation, such as repayment of previous lease payments, to a lessee who voluntarily relinquishes a lease. *See id.*

55.    BOEM administers the Outer Continental Shelf leasing program pursuant to its renewable energy regulations under OCSLA, contained in 30 C.F.R. Part 585. BOEM identifies leasing areas, conducts environmental assessments prior to leasing, and then leases the areas out, usually through a competitive bidding process. *Id.* §§ 585.102, .201–.232.

56.    Once a lease is sold, a lessee must submit a plan for site assessment activities. *Id.* §§ 585.600, .605–.613. If BOEM approves the site assessment plan, the

18

lessee has five years to conduct site assessment activities to gather necessary data. *Id.* § 585.235(a)(1).

57. The lessee must then prepare a proposal for the development of a wind energy facility and submit an application for a construction and operations plan. *Id.* §§ 585.600, .620–.628. The construction and operations plan must demonstrate, among other things, that the project will be conducted in a manner that does not unreasonably interfere with other uses of the Outer Continental Shelf, including those relating to national security or defense. *Id.* § 585.621(d).

58. BOEM then conducts a thorough review of a project's construction and operations plan, including developing an environmental impact statement, coordinating with other agencies and interested stakeholders, and complying with numerous other federal laws. *Id.* § 585.628; 43 C.F.R. pt. 46. BOEM must review the application to ensure compliance with OCSLA and its regulations and then "approve, disapprove, or approve [the plan]" with modifications. 30 C.F.R. §§ 585.613(e), .628(f).

59. BOEM's regulations require BOEM to ensure that activities authorized under its renewable energy regulations are carried out "in a manner that provides for and reaches a rational balance among" the twelve factors enumerated by OCSLA. *Id.* § 585.102(a). The regulations further state that "to the extent [the factors] conflict or are otherwise in tension, none of [the factors] inherently outweighs or supplants any other." *Id.*

## II.   The National Environmental Policy Act

60. NEPA requires federal agencies to prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the

human environment." 42 U.S.C. § 4332(C). Pursuant to that requirement, an agency must take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives.

61. To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies may prepare an environmental assessment. *Id.* § 4336(b)(2). If an agency determines that the proposed action will not have significant effects, accounting for mitigation, it can issue a finding of no significant impact. *Id.* If the environmental assessment reveals that there may be significant effects, an environmental impact statement is required. *Id.* § 4336(b)(1)–(2). Either level of review requires public participation opportunities and consideration of alternatives to the proposed action. *Id.* § 4332(C)(iii), (F), (H).

## III.   The Judgment Fund Act

62. The Judgment Fund Act created a permanent, indefinite appropriation administered by the Department of the Treasury from which the federal government may pay final judgments, awards, and compromise settlements. 31 U.S.C. § 1304.

63. The Judgment Fund may be used when: (1) payment is not otherwise provided for, (2) payment is certified by the Secretary of the Treasury, and (3) the judgment, award, or settlement is payable under certain statutory provisions, including 28 U.S.C. § 2414. 31 U.S.C. § 1304(a). That provision, 28 U.S.C. § 2414, allows "compromise settlements of claims referred to the Attorney General for defense of imminent litigation or suits against the United States, or against its

agencies or officials upon obligations or liabilities of the United States, made by the Attorney General or any person authorized by him."

64.     The U.S. Government Accountability Office's *Principles of Federal Appropriations Law*, known as the Red Book, explains that "[l]itigation is not imminent for purposes of this provision merely because a claimant will sue if the agency does not pay. There must be a legitimate dispute over either liability or amount. Absent such a dispute or impasse, there is nothing to refer to the Attorney General."[10]

65.     The Office of Legal Counsel has similarly concluded that a settlement is payable from the Judgment Fund only if the "underlying 'cause[]' of a settlement could have led to a money judgment, had no settlement been reached."[11]

## FACTUAL ALLEGATIONS

## I.     New York's Efforts to Develop Offshore Wind

66.     In 2018, the New York Public Service Commission adopted the Offshore Wind Standard. In doing so, the Public Service Commission recognized that offshore wind:

> is projected to provide numerous benefits in addition to . . . reducing greenhouse gas emissions. Because of its proximity and direct access to load centers, offshore wind would provide substantial reliability and diversity benefits to the electric system. Offshore wind also has the potential to create thousands of jobs for New Yorkers, both in construction of the facilities and in the operations and maintenance of

---

[10] 3 Gov't Accountability Off., GAO-08-978SP, Principles of Federal Appropriations Law 14-35 (3d ed. 2008), https://www.gao.gov/assets/2019-11/203470.pdf.

[11] Availability of Judgment Fund in Cases Not Involving a Money Judgment Claim, 13 Op. O.L.C. 98, 103 (1989).

the completed projects. It may also produce significant public health benefits by displacing fossil-fired generation in the downstate area.[12]

67.    The Offshore Wind Standard requires utilities and other load-serving entities (entities that provide electricity to customers) to procure offshore wind RECs, which represent the environmental attributes of offshore wind-generated renewable energy delivered into New York.

68.    In July 2019, the New York State Legislature passed the Climate Act, which requires the development of 9 gigawatts of offshore wind energy by 2035. Climate Act § 4(5); N.Y. Pub. Serv. Law § 66-p(5). The Climate Act also sets broader greenhouse gas-reduction targets of 40% from 1990 levels by 2030 and 85% from 1990 levels by 2050. Climate Act §§ 1, 2; N.Y. Env't Conserv. Law § 75-0107. It calls for New York's electricity sector to be 100% free of greenhouse gas emissions by 2040, with 70% of that electricity generated by renewable energy sources. Climate Act § 1(12)(d); N.Y. Pub. Serv. Law § 66-p(2).

69.    NYSERDA, a public benefit corporation and public authority incorporated under Title 9 of the New York State Public Authorities Law, administers New York's Offshore Wind Standard pursuant to orders issued by the New York Public Service Commission and in furtherance of the goals of the Climate Act. As administrator of this program, NYSERDA conducts offshore wind solicitations, which seek proposals from offshore wind developers to deliver offshore wind energy to New

---

[12] Order Establishing Offshore Wind Standard and Framework for Phase 1 Procurement at 3, *In re Offshore Wind Energy*, No. 18-E-0071 (N.Y. Pub. Serv. Comm'n July 12, 2018), NYSDPS-DMM Item No. 49.

York. The competitively selected projects enter into contracts to sell RECs to NYSERDA, which then sells the certificates to utilities and other load-serving entities to comply with the Offshore Wind Standard.

## II. New Jersey's Efforts to Develop Offshore Wind

70. With its extensive coastline, which is subject to higher sea-level rise than elsewhere, and a temperature that is rising faster than the rest of the northeast United States, New Jersey has taken steps to achieve greenhouse gas emission reductions, including by spurring the development of offshore wind. For instance, New Jersey passed the Global Warming Response Act, which requires the State to achieve 80% reductions from 2006 greenhouse gas emissions by 2050. 2007 N.J. Laws ch. 112 § 2; N.J. Stat. Ann. § 26:2C-38. As the power generation sector is the sector that emits the second-largest volume of greenhouse gases, reducing those emissions is key to achieving these goals.

71. In 2010, the New Jersey Legislature enacted the Offshore Wind Economic Development Act, which authorized the New Jersey Board of Public Utilities (NJBPU) to conduct solicitations for offshore wind projects to receive offshore wind RECs in exchange for providing electricity to the New Jersey electric grid. The goal of these solicitations was to enable a percentage of New Jersey's electric load to be supplied by offshore wind energy. In 2018, New Jersey's initial statutory requirement of 1.1 gigawatts of offshore wind energy was increased to 3.5 gigawatts. 2018 N.J. Laws ch. 17 § 2; § 48:3-87(d)(4).

72. By 2022, through a series of executive orders, statutory enactments, and policy planning documents, New Jersey's offshore wind-generation goal increased

23

from 7.5 gigawatts by 2035 to 11 gigawatts by 2040, and the State accelerated the timeline for reaching its goal of 100% clean energy from 2050 to 2035. Exec. Order No. 307 (N.J. Governor Philip D. Murphy) (Sept. 21, 2022); Exec. Order No. 315 (N.J. Governor Philip D. Murphy) (Feb. 15, 2023).

### III.   History of the Attentive Lease

73.   In October 2017, New York sent BOEM a document identifying an "area for consideration for the potential locating of offshore [wind energy areas]."[13] The area was located in the New York Bight, a large, shallow area between Long Island and the New Jersey coast.

74.   The following spring, BOEM published a call for information and nominations, in which it requested public comment about potential commercial wind leasing opportunities in the New York Bight. After receiving responses to its call for information, BOEM began the process of identifying "wind energy areas," the areas of the New York Bight most suitable for leasing.

75.   As part of its identification process, BOEM coordinated with DOD to assess the potential wind energy areas' compatibility with national security. DOD identified portions of the New York Bight as "wind exclusion" areas due to the potential conflict of wind turbines with military exercise areas and with weather radar, depending on the height of the turbines.

---

[13] Commercial Leasing for Wind Power on the Outer Continental Shelf in the New York Bight—Call for Information and Nominations, 83 Fed. Reg. 15602, 15603–04 (Apr. 11, 2018).

76. In response, BOEM withdrew some of its recommended wind energy areas from consideration and promised to work with the U.S. Air Force to ensure that any future development adopted appropriate mitigation measures. BOEM also announced its intent to continue working with DOD to ensure that any wind energy projects selected for construction would adopt mitigation measures to avoid potential impacts to the North American Aerospace Defense Command's air surveillance radar.

77. In early 2021, after more than three years of review and stakeholder engagement, BOEM identified almost 800,000 acres in the New York Bight as suitable for wind energy development. A few months later, BOEM proposed to offer eight New York Bight lease areas for sale in a competitive auction.

78. BOEM subsequently conducted an environmental analysis that assessed the potential impacts of the issuance of the proposed leases, including the environmental consequences associated with site characterization and assessment. In January 2022, BOEM published a final sale notice in which it described its plan to auction off six offshore leases in the New York Bight.

79. BOEM held the auction in February 2022. The auction drew winning bids from six developers that totaled around $4.37 billion, making it the country's highest-grossing competitive offshore energy lease sale in history.

80. Attentive bid $795 million and won lease number OCS-A 0538, a lease area of over 84,000 acres located around 36 nautical miles off the New Jersey coast and 47 nautical miles off the New York coast. Attentive's Lease area is depicted in yellow-orange on the color version of the map below:



81.   In April 2022, Attentive entered into a lease agreement with BOEM.

82.   Around the same time, BOEM also entered into a lease agreement with TotalEnergies Carolina Long Bay, LLC (Carolina Long Bay), another TotalEnergies subsidiary, for a wind lease off the coast of North Carolina.

83.   Attentive submitted a site assessment plan for the entire Lease area in January 2023, and BOEM approved the plan, with amendments, in December 2023.

84.   In October 2023, during its third offshore wind solicitation, NYSERDA provisionally awarded three projects, including Attentive Energy One, which would

have occupied around one half of the Lease area. The Attentive Energy One Project was expected to interconnect into New York City and to have a nameplate capacity of 1,404 megawatts, enough to power over 700,000 New York homes.

85.     NYSERDA did not make a final award for the Attentive project (or the other two projects) at that time due to a change in the production plans of the projects' wind turbine supplier. However, NYSERDA anticipated that Attentive would bid into future wind solicitations. As recently as January 23, 2026, Attentive submitted a progress report to BOEM describing the Lease areas as having two wind energy projects, including the Attentive Energy One Project.

86.     In January 2024, as part of its third offshore wind solicitation, NJBPU made a final award to the Attentive Energy Two Project, which would have occupied the other half of the Lease and was slated to provide 1,342 megawatts of energy to New Jersey, enough to power around 650,000 New Jersey homes.

87.     In September 2024, Attentive submitted for BOEM's review a construction and operations plan for the Attentive Energy Two Project. At the time of the Lease cancellation, the plan was still under review by BOEM.

88.     In October 2024, BOEM issued a final programmatic environmental impact statement analyzing the potential impact of wind energy development in the six lease areas in the New York Bight. BOEM recognized the importance to New York and New Jersey of developing the lease areas in the New York Bight, stating that it "would assist with meeting several state mandates for renewable energy" and

27

referencing New York's goal of procuring 9 gigawatts of offshore wind energy by 2035 and New Jersey's goal of procuring 11 gigawatts of offshore wind energy by 2040.[14]

89.    Two months later, BOEM issued a record of decision identifying the avoidance, minimization, mitigation, and monitoring measures that BOEM would apply as conditions of approval of the six developers' construction and operations plans. The record of decision specifies that the developers must coordinate with certain radar operators, including DOD's Military Aviation and Installation Assurance Siting Clearinghouse, to assess whether any of the offshore wind projects could impermissibly interfere with radar, and if so, to institute mitigation measures.

90.    In January 2025, Attentive and BOEM entered into an amended lease agreement. The amended agreement provides that "[a]ny cancellation or suspension ordered by the Lessor that is predicated on a threat of serious irreparable, or immediate harm or damage, or on an imminent threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities."[15] The amended agreement also provides that "[a]ny cancellations are subject to the limitations and protections contained in subsections 5(a)(2)(B) and (C) of [OCSLA] (43 U.S.C. § 1334(a)(2)(B) and (C))."[16]

---

[14] 1 BOEM, BOEM 2024-051, New York Bight Final Programmatic Environmental Impact Statement at ES-4 (Oct. 2024), https://www.boem.gov/renewable-energy/state-activities/boemnybpeisvolichapters1-4october2024.

[15] Amendment & Restatement of Renewable Energy Lease Agreement OCS-A 0538 Between the U.S. & Attentive Energy LLC at 4 (Jan. 16, 2025).

[16] *Id.* at 3–4.

**IV.    The Trump Administration's Unlawful Attempts to Hinder the Development of Wind Energy**

91.    In January 2025, President Trump was inaugurated. Since that time—and despite President Trump's declaration of an energy emergency—he and his Administration have taken a series of actions to hinder the development of offshore wind energy in the United States. Federal courts have repeatedly reviewed those actions and, in decisions awarding preliminary or permanent relief, found them unlawful and arbitrary and capricious.

92.    On January 20, 2025, President Trump issued a memorandum that withdrew all areas of the Outer Continental Shelf from consideration for wind energy leasing and halted all federal approvals necessary for the development of offshore and onshore wind energy (the Wind Memo). Pursuant to the Wind Memo, several federal agencies immediately stopped issuing any wind energy authorizations. On December 8, 2025, the United States District Court for the District of Massachusetts issued a memorandum and order declaring that the pause "constitutes a final agency action that is arbitrary and capricious and contrary to law" and vacating it. *New York v. Trump*, 811 F. Supp. 3d 215, 226 (D. Mass. 2025). The federal government ultimately did not pursue an appeal of this determination.

93.    The same day the Wind Memo was issued, President Trump also declared a "National Energy Emergency" (the Energy Emergency Memo), asserting that there was "insufficient energy production" in the United States and directing

agencies to expedite and facilitate "energy" development.[17] The Energy Emergency Memo defined "energy" to exclude wind and solar facilities.

94.    In response to the Energy Emergency Memo, in April 2025, Interior announced that it would "implement emergency permitting procedures to accelerate the development of domestic energy resources," excluding wind and solar facilities.[18] As part of these procedures, Interior "will be adopting an alternative National Environmental Policy Act compliance process to allow for more concise documents and a compressed timeline. Projects requiring a full environmental impact statement, typically a two-year process, will be reviewed in roughly 28 days."[19]

95.    Also in April 2025, BOEM issued an order requiring Empire Wind, a wind farm under construction in the New York Bight, to "halt all ongoing activities related to the Empire Wind Project on the outer continental shelf to allow time for [BOEM] to address feedback it has received, including from the National Oceanic and Atmospheric Administration (NOAA), about the environmental analyses for that project."[20] BOEM described this order as an "outgrowth" of the review that Interior

---

[17] Exec. Order No. 14156, 90 Fed. Reg. 8433, 8434 (Jan. 29, 2025).

[18] Press Release, Interior, Department of the Interior Implements Emergency Permitting Procedures to Strengthen Domestic Energy Supply (Apr. 23, 2025), https://www.doi.gov/pressreleases/department-interior-implements-emergency-permitting-procedures-strengthen-domestic.

[19] *Id.*

[20] BOEM, Acting Director's Order to Halt All Ongoing Activities Issued to Empire Offshore Wind LLC (Apr. 16, 2025), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/BOEM%20Director%26%23039%3Bs%20Order%20Empire%20Wind.pdf.

was undertaking pursuant to President Trump's Wind Memo. The following month, BOEM lifted the order without explanation.

96.     In July 2025, President Trump issued another executive order targeting wind energy, this time directing the Interior Secretary to eliminate all sources of "preferential treatment" for wind and solar energy.[21] The executive order characterized wind energy as "expensive and unreliable," as "denigrat[ing] the beauty of our Nation's natural landscape," and as "threaten[ing] national security by making the United States dependent on supply chains controlled by foreign adversaries."[22]

97.     In August 2025, BOEM issued another order, now directing a halt to work on Revolution Wind, a wind farm under construction off the coast of Rhode Island. BOEM stated that this order was the result of a national security review undertaken pursuant to President Trump's Wind Memo. The project developer sought judicial review of the order in this Court, and a few weeks later, the Court (Lamberth, J.) granted the developer's motion for a preliminary injunction, finding that the developer had demonstrated a likelihood of success on the merits. Specifically, the Court explained that BOEM's order represented "a clear change in position on the part of [BOEM], which previously certified that the [Revolution Wind] project did not implicate national security or interference concerns as part of its multiyear, multiagency approval process," and that BOEM "did not make any factual findings or cite any reasons to believe that [] Revolution Wind was no longer in

---

[21] Exec. Order No. 14315, 90 Fed. Reg. 30821 (July 10, 2025).

[22] *Id.* § 1.

compliance with [OCSLA]." Tr. of Prelim. Inj. Hr'g at 41:1–5, :13–16, *Revolution Wind, LLC v. Burgum*, No. 25-cv-2999 (D.D.C. Sept. 26, 2025), ECF No. 39.

98.    On December 22, 2025, Acting Director Giacona issued orders directing five offshore wind projects, including Empire Wind and Revolution Wind, to "suspend all ongoing activities related to the [projects] on the Outer Continental Shelf for the next 90 days for reasons of national security."[23] These single-page suspension orders were purportedly based on "national security threats" identified in a November 2025 classified assessment conducted by DOD. The suspension orders stated that BOEM could "further extend the 90-day suspension" pending its discussions with DOD.[24]

99.    Between January and February 2026, federal district courts, including this Court, stayed or preliminarily enjoined all five suspension orders based on determinations that the classified assessment, which the courts reviewed *in camera*, did not identify the immediate national security risk asserted by BOEM. Prelim. Inj., *Revolution Wind* (Jan. 12, 2026), ECF No. 63; Min. Order, *Empire Leaseholder LLC v. Burgum*, No. 26-cv-04 (D.D.C. Jan. 14, 2026); Order, *Va. Elec. & Power Co. v. U.S. Dep't of the Interior*, No. 25-cv-830 (E.D. Va. Jan. 16, 2026), ECF No. 81; Elec. Order, *Vineyard Wind 1 LLC v. U.S. Dep't of the Interior*, No. 26-cv-10156 (D. Mass. Jan. 27, 2026), ECF No. 71; Min. Order, *Sunrise Wind LLC v. Burgum*, No. 26-cv-28 (D.D.C. Feb. 2, 2026).

---

[23] BOEM, Acting Director's Orders to Suspend All Ongoing Activities, *supra* note 4.

[24] *Id.*

100.    In April 2026, a federal district court preliminarily enjoined various federal agencies, including Interior and BOEM, from enforcing several actions designed to inhibit the development of wind and solar energy, including a July 2025 Interior memo that mandated additional review procedures for wind and solar energy projects and an August 2025 order by Interior Secretary Burgum directing Interior to consider a proposed energy project's "capacity density" when reviewing project applications, a metric that was designed to disadvantage wind and solar. *RENEW Ne. v. U.S. Dep't of the Interior*, No. 25-cv-13961, 2026 WL 1078282 at *1 (D. Mass. Apr. 21, 2026). The court found that each of the challenged actions was arbitrary and capricious or contrary to law.

101.    The Trump Administration's actions reflect a concerted effort to hinder the development of wind energy, an industry that is critically important to the States.

102.    Those actions are consistent with statements by Interior Secretary Burgum and President Trump vociferously opposing wind energy.

103.    Interior Secretary Burgum has described offshore wind energy as "a scam"[25] and "one of the most expensive, unreliable, subsidy-dependent schemes ever pushed upon American taxpayers."[26] He has also stated that, "[u]nder this

---

[25] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 23, 2025, at 2:04 PM), https://x.com/SecretaryBurgum/status/2003542190170210637 [https://perma.cc/X6RE-E3WQ].

[26] Secretary Doug Burgum (@SecretaryBurgum), X (Dec. 22, 2025, at 3:23 PM), https://x.com/SecretaryBurgum/status/2003199842152251802 [https://perma.cc/55JT-MKJT].

administration, there is not a future for offshore wind because it is too expensive and not reliable enough."[27]

104. President Trump, meanwhile, has called wind "the worst" and "most expensive form of energy" and has stated that offshore wind projects "kill your birds" and "ruin your beautiful landscapes."[28] Earlier this year, he announced that "my goal is not to build any windmills in this country."[29] President Trump recently told Interior Secretary Burgum that "I can proudly say, Doug, that we have not approved one windmill since I've been in office. And we're going to keep it that way. My goal is to not let any windmill be built."[30]

105. As a result of the Trump Administration's numerous anti-wind actions, and despite the fact that courts continue to find these actions unlawful, the offshore wind industry has suffered loses. In July 2025, Equinor, the company behind Empire Wind, reported an impairment of $955 million due to "regulatory changes in the U.S.,"

---

[27] Kimball, *supra* note 7.

[28] Helena Horton, *Tilting at Windmills? Trump's Claims About Turbines Fact-Checked*, The Guardian (July 28, 2025, at 8:21 AM), https://www.theguardian.com/environment/2025/jul/28/are-trump-claims-about-wind-power-correct; Reuters, *Trump Orders Suspension of New Offshore Wind Power Leasing* (Jan. 21, 2025, at 11:03 AM), https://www.reuters.com/sustainability/climate-energy/trump-signals-end-new-us-wind-power-leasing-2025-01-21.

[29] Rupar, *supra* note 6.

[30] Tamara Keith, *Trump Takes Aim at Windmills Despite Increasing Energy Costs*, NPR (Mar. 24, 2026, at 5:00 AM), https://www.npr.org/2026/03/24/nx-s1-5684158/trump-takes-aim-at-windmills-despite-increasing-energy-costs. While the President stated his opposition to windmills, which use wind for mechanical tasks like grinding grain or pumping water, it appears from context that he was referring to wind turbines, which use wind to generate electricity.

"tariffs," and "a presidential order stopping permitting of new offshore wind projects."[31] Ørsted, the company behind Revolution Wind and Sunrise Wind, both of which were the subject of BOEM's December 2025 suspension orders, similarly reported an offshore wind impairment of around $490 million, due in large part to the Revolution Wind stop-work order, the Revolution Wind and Sunrise Wind suspension orders, and "regulatory uncertainty in the US."[32] And in February 2026, TotalEnergies announced impairments of $700 million, for offshore wind "in particular."[33]

## V.   The Settlement Agreement Between Federal Defendants and Attentive

106.   On March 23, 2026, Interior issued a press release announcing that it had reached a "landmark agreement" with TotalEnergies pursuant to which both the Attentive Lease and the Carolina Long Bay lease would be canceled.[34] According to the press release:

> Today, the Department of the Interior announced a landmark agreement with TotalEnergies for the company to redirect capital from

---

[31] Gwladys Fouche & Nerijus Adomaitis, *Blaming Trump, Equinor Books a $955 Million US Offshore Wind Writedown*, Reuters (July 23, 2025, at 2:57 PM), https://www.reuters.com/sustainability/climate-energy/blaming-trump-equinor-books-955-million-us-offshore-wind-writedown-2025-07-23/.

32 Ørsted, Annual Report 2025, at 29, 144 (Feb. 6, 2026), https://cdn.orsted.com/-/media/annual-2025/annual-report-2025.pdf?rev=34ff0f324dc1429bac1bc84382c30a9d.

[33] Press Release, TotalEnergies, Fourth Quarter and Fully Year 2025 Results, at 12 (Feb. 11, 2026), https://totalenergies.com/system/files/documents/totalenergies_pr-results-q4-2025_2026_en.pdf.

[34] Press Release, Interior, *supra* note 8. The offshore wind leases referenced here include the Attentive Lease and the Carolina Long Bay lease.

expensive, unreliable offshore wind leases toward affordable, reliable natural gas projects that will provide secure energy for hardworking Americans.

TotalEnergies has committed to invest approximately $1 billion—the value of its renounced offshore wind leases—in oil and natural gas and LNG [liquefied natural gas] production in the United States. Following their new investment, the United States will reimburse the company dollar-for-dollar, up to the amount they paid in lease purchases for offshore wind. Under this innovative agreement driven by President Donald J. Trump's Energy Dominance Agenda, the American people will no longer pay for ideological subsidies that benefited only the unreliable and costly offshore wind industry.[35]

107.    The press release explained that, in exchange for the cancellation of its two leases, TotalEnergies would be reimbursed $928 million from the U.S. government and would spend an equivalent amount on the construction of a liquefied natural gas plant and the development of "upstream conventional oil" and shale gas production. "Additionally, in light of the national security concerns," the press release continued, "TotalEnergies has pledged not to develop any new offshore wind projects in the United States."[36]

108.    On March 23, 2026, Interior and Attentive executed the Settlement Agreement providing for the cancellation of the Attentive Lease. On the same day, Interior and Carolina Long Bay executed a separate settlement agreement providing for cancellation of the Carolina Long Bay lease.

109.    The Settlement Agreement states that DOD "raised classified national security concerns about development of this lease that were not known to BOEM at

---

[35] *Id.*

[36] *Id.*

the time of lease issuance and that would have prevented the lease issuance if they had been considered." Settlement Agreement at 2. "[I]f this offshore wind project would have continued," the Settlement Agreement reads, "BOEM would have issued to Attentive an order to suspend construction and operations of this project indefinitely due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." *Id.* According to the Settlement Agreement, if BOEM had issued a suspension order, Attentive "would have claimed breach of contract . . . and filed suit in the United States Court of Federal Claims." *Id.*

110.    The Carolina Long Bay settlement agreement contains identical language.[37]

111.    The recitations in the Settlement Agreement do not reflect the actual chronology of events and do not show that litigation was imminent, as required to use the Judgment Fund.

112.    The parties to the Settlement Agreement were effectively on the same side. TotalEnergies first approached Interior to propose that Interior cancel the Lease

---

[37] Settlement Agreement Between the U.S. & TotalEnergies Carolina Long Bay, LLC, at 2 (Mar. 23, 2026), https://www.boem.gov/sites/default/files/documents/renewable-energy/state-activities/Carolina%20Bay%20Agreement.pdf?VersionId=HopJl_XAKE1BrLqv9SAPk5bR.RVf4Es6.

so that TotalEnergies could receive a refund. Indeed, TotalEnergies' chief executive officer asserted that that Agreement "came from us—we took the initiative."[38]

113.    In fact, TotalEnergies and Interior Defendants were trying to figure out how to effectuate the cancellation of the Attentive and Carolina Long Bay leases as early as November 16, 2025, as demonstrated by Interior's drafting of a "Memorandum of Understanding Between the Department of the Interior and TotalEnergies Renewables USA, LLC on Offshore Wind Lease OCS-A 0545 [the Carolina Long Bay lease]."

114.    Notably, although the Attentive and Carolina Long Bay settlement agreements assert that, had Interior Defendants not reached settlements with TotalEnergies, BOEM "would have issued" suspension orders "due to national security concerns, similar to" BOEM's five December 2025 suspension orders, the chronology of events does not support the assertion that the Settlement Agreements were motivated by such concerns. Rather, Interior and BOEM were working on a "memorandum of understanding" with TotalEnergies as early as November 16, 2025, before BOEM Acting Director Giacona first reviewed the classified information that purportedly motivated the suspension orders. Decl. of Matthew Giacona ¶ 6, *Sunrise Wind* (Jan. 23, 2026), ECF No. 31-1 (declaration from Acting Director Giacona affirming that he first reviewed the classified information on November 26, 2025).

---

[38] Amy Harder, *TotalEnergies CEO on Controversial Offshore Wind Deal: "It's Our Money"*, Axios (Apr. 17, 2026), https://www.axios.com/2026/04/17/totalenergies-trump-offshore-wind-deal.

115. Moreover, the Settlement Agreement does not discuss a referral to the Attorney General or evince any substantive involvement by DOJ, which is responsible for negotiating any settlement that requires a payment from the Judgment Fund. *See* 30 C.F.R. § 256.1. Nor do any DOJ personnel appear on Interior emails from November and December 2025 containing draft "contract[s] of mutual rescission" and "memorand[a] of understanding" between Interior and TotalEnergies.

116. The Settlement Agreement requires TotalEnergies to spend $795 million—the cost Attentive paid for the Lease—on "eligible expenditures" directed toward "conventional energy projects," i.e., fossil fuel-based energy projects. Settlement Agreement at 3. The Settlement Agreement allows TotalEnergies to apply past expenditures made after November 18, 2025, toward the $795 million. Once TotalEnergies had made and accounted for those expenditures, the Settlement Agreement states, Interior would cancel the Lease and "submit a request for payment in the amount of $795,000,000 to the Judgment Fund Branch at the United States Department of the Treasury's Bureau of the Fiscal Service." *Id.* at 3–4, 7.

117. Pursuant to the Settlement Agreement, Interior canceled the Lease by letter on April 17, 2026.

118. The letter reiterates Interior's assertion that it "would not have issued the lease in May 2022 had it known the sensitive information that it recently learned from [DOD]." Letter at 1.

119. The letter further states that, on April 13, 2026, TotalEnergies provided Interior with documentation demonstrating that the company had made $795 million

39

of eligible expenditures on conventional energy projects. Accordingly, per the letter, "[Interior] is hereby cancelling and rescinding Lease No. OCS-A 0538" and "will, through the Department of Justice, request payment in the amount of $795,000,000 to Attentive from the Judgment Fund Branch at the United States Department of Treasury." *Id.* at 1–2.

120. On April 17, 2026, ten days after the Lease cancellation, Interior announced that it had reached new, nearly identical agreements with Bluepoint Wind, which holds an offshore wind lease in the New York Bight, and Golden State Wind, which holds a lease off California's central coast. Interior asserts that both agreements "follow[] the model of [Interior's] recent deal with TotalEnergies."[39] Two months later, Interior announced additional agreements to cancel four leases held by affiliates of Invenergy, one off the California coast, one in the New York Bight, and two in the Gulf of Maine. Shortly thereafter, Interior announced an agreement to cancel a lease held by Duke Energy in the Carolina Long Bay, and in early August 2026, RWE U.S. Offshore announced that Interior would pay it $1.22 billion to cancel three leases off the coast of New York, California, and Louisiana.

121. In total, as of August 14, 2026, the Federal Defendants have agreed, in violation of law, to pay more than $4 billion of taxpayer money from the Judgment

---

[39] Press Release, Interior, *Interior Announces Two Historic Agreements to Promote Affordable, Reliable Energy Production in the United States* (Apr. 27, 2026), https://www.doi.gov/pressreleases/interior-announces-two-historic-agreements-promote-affordable-reliable-energy.

Fund in the middle of an energy affordability crisis to advance the President's policy objective of suppressing the growth of the country's offshore wind industry.

## VI.    Impacts on and Harm to the States

122.    The Settlement Agreement and Lease cancellation have significant impacts on and cause harm to the States.

### A.    Impacts on and Harm to New York

123.    The Lease cancellation and the Settlement Agreement that precipitated it harm New York's energy, economic, and environmental and public health interests. Further, New York has significant reliance interests in the Lease. In particular, as discussed below, New York has relied on the development of the Lease area as a component of its strategy to support grid reliability and energy diversification; economic growth; and climate goals and environmental and public health. In cancelling the Lease, Interior Defendants did not acknowledge these reliance interests.

#### 1.    New York's Energy Interests

124.    The Lease cancellation and Settlement Agreement will harm New York's energy interests by depriving New York of a planned source of offshore wind energy that would have been sufficient to serve 700,000 homes in New York City and the surrounding area.

125.    Offshore wind energy is critical to meeting New York's growing need for reliable, affordable, and clean energy. According to analysis performed for the 2025 State Energy Plan, future electricity demand is projected to grow and will require

investments in the expansion of the electric system, including the development of new offshore wind projects.

126.    Maintaining the reliability of New York's electric system will require substantial deployment of new energy resources, such as offshore wind, alongside modernization of essential transmission and distribution infrastructure. According to the 2025 State Energy Plan, increasing electricity demand ("load growth"), including from new large loads associated with economic development and the operation of data centers, will drive substantial increases in electricity demand in New York—8% by 2030 alone, with growth accelerating to 24% by 2040 and 42% by 2050.

127.    At the same time, New York's Independent System Operator (NYISO) reports that by 2028, 6.5 gigawatts of fossil fuel generation in New York will reach an age beyond which 95% of similarly aged U.S. generators are expected to retire. Aging generators pose reliability risks even when they are extended, meaning that investment to backfill these resources is essential for long-term reliability.

128.    Consistent with those findings, NYISO, in its October 2025 Q3 Short-Term Assessment of Reliability (STAR) Report, identified a need for additional electricity generation, demand-side solutions, and/or transmission solutions to ensure electric system reliability in New York City as early as summer 2026. NYISO's 2026 Q1 STAR Report, issued in April 2026, confirms a continuing reliability need.

129.    Each offshore wind lease in the New York Bight constitutes an important component of New York's efforts to secure enough offshore wind energy to

42

meet demand, and the loss of any lease makes it less likely that New York will achieve its energy goals.

130. Wind energy facilities built on the Lease area were anticipated to interconnect directly into New York's Load Zone J, the load zone for New York City, without crossing through residential areas or sensitive habitats. In fact, BOEM built a NYISO Zone J reference price into the operating fee formula in the Attentive Lease agreement, indicating its expectation that Attentive would sell electricity into New York City.

131. Those wind energy facilities would provide critical energy diversity benefits (benefits from having diverse sources of electricity) to New York City. A recent analysis commissioned by NYISO found that the availability of a large quantity of offshore wind energy transmitted directly into New York City would enhance grid reliability in cold weather by reducing dependency on oil and natural gas.

132. The Lease cancellation and other anticipated lease cancellations will severely reduce available energy production in the New York Bight. The settlement agreements that facilitated these Lease cancellations also serve as a blueprint for other offshore wind leaseholders to receive compensation for the cancellation of their leases, an appealing prospect for project developers that have obligations to shareholders and that are unable to make progress on projects as a result of the Trump Administration's opposition to wind energy. If other leaseholders make similar deals with Interior, the amount of energy production available in the New

York Bight may be reduced by as much as 80%, further eroding New York's ability to rely on offshore wind resources as part of its planning for a reliable and diverse energy portfolio.

133.    The importance of each offshore wind lease in the New York Bight is magnified by the publication of the Wind Memo on January 21, 2025, which made all areas of the Outer Continental Shelf that were not leased as of that date unavailable for wind energy leasing. The Wind Memo therefore drastically limited the available locations for offshore wind projects.

134.    New York's efforts to diversify its energy supply and enhance grid resiliency and capacity in order to support downstate electric load growth while also meeting its climate goals, including the procurement of 5–7 gigawatts of wind energy by 2040, will be compromised if the Lease cancellation is not set aside.

*2.    New York's Economic Interests*

135.    The Settlement Agreement and Lease cancellation will also inflict economic harms on New York.

136.    The Attentive Energy One Project was projected to deliver $25.6 billion in economic benefits to New York State over the 25-year life of the project. The anticipated economic benefits included $10 billion in savings to ratepayers across New York State, with $500 million in electric bill savings for low-income households. The project was also expected to deliver $1.9 billion in health benefits associated with lower fossil fuel emissions, with more than $1.3 billion of those health benefits accruing in New York City. Further, the project was expected to generate substantial tax revenue and to create 1,716 new jobs.

44

137. The Lease cancellation will deprive New York of the economic benefits that would have resulted from development of the Lease area by Attentive or another offshore wind developer. Further, the Lease cancellation will chill the investment in and development of offshore wind energy in New York, cutting off a significant new source of economic benefits to the State. These economic benefits include jobs, investments in electrical infrastructure, substantial tax revenues, and payments in lieu of taxes.

138. Further, NYSERDA has expended substantial resources to promote the development of offshore wind energy in the New York Bight. As a result of the Lease cancellation, NYSERDA will need to redirect additional resources to analyze the impact of the cancellation and to determine whether the clean energy that would have come from Attentive's development of the Lease can be replaced.

139. Any such replacement, if one exists, will likely be more costly, as most of the remaining lease areas in the New York Bight are farther from New York City, and the farther a wind energy project is from its interconnection point, the more expensive and challenging it is to permit, construct, and maintain.

140. The Lease cancellation will also impose market harms on New York, likely making it more expensive for New York to procure offshore wind energy in the future. When NYSERDA solicits proposals from offshore wind developers, it seeks a competitive solicitation, that is, a solicitation in which there is more supply from offshore wind developers than there is demand for wind energy. A competitive

solicitation allows NYSERDA to secure contracts with offshore wind developers at lower cost than it would in a noncompetitive solicitation.

141.   Because so few leases currently exist in the New York Bight, the loss of any one lease—here, the Attentive Lease—increases the chance that NYSERDA's future offshore wind solicitations will not be as competitive, increasing the price New York must pay to procure offshore wind energy.

> 3.   *New York's Climate Goals and Environmental and Public Health Interests*

142.   Finally, the Settlement Agreement and Lease cancellation will adversely affect New York's ability to mitigate climate change and the health effects of fossil fuel-based energy.

143.   The New York State Legislature enacted the Climate Act in July 2019. The Climate Act, as amended, sets greenhouse gas-reduction targets of 40% from 1990 levels by 2030 and 85% from 1990 levels by 2050. Climate Act § 1–2; N.Y. Env't Conserv. Law § 75-0107. It calls for New York to have a 100% emissions-free electricity sector by 2040 and to be powered by 70% renewable energy. Climate Act § 1(12)(d); N.Y. Pub. Serv. Law § 66-p(2). The Climate Act also targets the development of 9 gigawatts of offshore wind energy by 2035. Climate Act § 4(5); NY. Pub. Serv. Law § 66-p(5).

144.   Offshore wind projects are expected to play a significant role as New York pursues a zero-greenhouse gas emissions electric system pursuant to the Climate Act. The core planning scenario of New York's 2025 State Energy Plan

includes 5 to 7 gigawatts of offshore wind being added to New York's electric system by 2040.

145. The Lease cancellation will impede New York's ability to fulfill its statutory and energy planning goals, thereby injuring its ability to implement its own laws. It also risks forcing New York to incur additional expenses to meet its emissions reduction and renewable energy targets.

146. The Lease cancellation will also have significant adverse environmental and public health consequences for New York.

147. Notably, the vast majority of electricity in New York City comes from fossil fuel-fired power plants. It is anticipated that incorporating electricity generated from offshore wind in the locations where gas turbines are now used to meet energy demand—for example, in the New York City metropolitan ozone nonattainment area—will reduce emissions and improve air quality for New Yorkers. By reducing the need for electricity generation from combustion turbines, the development of the Lease was anticipated to reduce emissions of fine particulate matter, nitrogen oxides, volatile organic compounds, and other hazardous air pollutants.

148. As noted above, by reducing emissions from fossil fuels, the Attentive Energy One Project was expected to deliver $1.9 billion in avoided health care costs to New York over its 25-year lease term. Any future development on the Lease would have similarly reduced emissions and generated large health benefits.

149. The Lease cancellation will delay reductions in greenhouse gas emissions and air quality improvements by stalling the transition from fossil fuel-based energy to energy derived from renewable sources, including offshore wind.

**B.    Impacts on and Harm to New Jersey**

150. The Settlement Agreement and Lease cancellation that precipitated it similarly have significant impacts on and cause harm to New Jersey's energy, economic, and environmental and public health interests. Further, New Jersey has significant reliance interests in the Lease. In particular, as discussed below, New Jersey has relied on the development of the Lease area as a component of its strategy to support grid reliability, energy diversification, and climate goals. In cancelling the Lease, Interior Defendants did not acknowledge these reliance interests.

*1.    New Jersey's Energy Interests*

151. The Lease cancellation and Settlement Agreement will harm New Jersey's energy interests by depriving New Jersey of a planned source of offshore wind energy in the New York Bight that constituted one-third of New Jersey's statutory requirement and over 10% of New Jersey's target of 11 gigawatts of offshore wind energy.

152. At the time of NJBPU's award, the Attentive Energy Two Project was one piece of New Jersey's long-term strategy to meet forecasted capacity demands on New Jersey's electric grid using clean energy. Scarcity and congestion issues on New Jersey's electric grid will worsen without energy from offshore wind, including the Attentive Energy Two Project, leading to higher electricity costs for the State and its residents.

153. Each offshore wind lease in the New York Bight constitutes an important component of New Jersey's efforts to secure enough offshore wind energy to meet demand, and the loss of any lease makes it less likely that New Jersey will achieve its energy goals.

154. The need for additional supply from offshore wind is critical because regional electric grid operator PJM Interconnection, LLC's (PJM) forward-looking planning studies already envision a worsening ratio of supply relative to demand—even when accounting for 11 gigawatts of offshore wind in New Jersey beginning in the early 2030s. Demand for electricity is currently outpacing supply on the regional grid as rapid load growth outpaces the addition of new generation.

155. New Jersey's plan of adding 11 gigawatts of offshore wind energy by 2040, including the Attentive Energy Two Project and as-yet unapproved projects on other existing BOEM leases in the New York Bight, would ease this problem by increasing available supply. Delay or loss of that generation would exacerbate the forecasted electricity supply problem, which also does not account for increasing demand from data centers and artificial intelligence.

156. The northeast portion of the PJM grid, in which New Jersey is located, also suffers from rising annual congestion costs. For example, from 2021 to 2022, congestion costs rose from $995 million to $2.5 billion. When the transmission system is congested, the most efficient source of electricity is not used, and the area with remaining electricity demand is served by alternative, less efficient, more expensive energy sources.

49

157. New Jersey's planned development of offshore wind generation and transmission would ease congestion and reduce costs, ultimately passing savings on to ratepayers, including New Jersey and its residents. New Jersey's offshore wind generation would complement the west-to-east supply of electricity, while also serving as an alternative source of electricity that would increase reliability and resilience for the PJM grid.

### 2. *New Jersey's Economic Interests*

158. The Settlement Agreement and Lease cancellation will also inflict economic harms on New Jersey.

159. The Attentive Energy Two Project includes a guarantee to spend $760 million dollars during the first ten years of operation and an estimated $3.1 billion in direct, indirect, and induced economic benefits to the New Jersey economy throughout the life of the project. Attentive is also required to pay New Jersey a research and monitoring fee of $15 million, half of which remains unpaid.

160. The Attentive Energy Two Project made various other financial commitments, including commitments to invest tens of millions of dollars in the development of offshore wind-related manufacturing facilities, leases, and operations and maintenance facilities and in offshore wind-related workforce training and innovation, business development, and educational and community programs. At the time of NJBPU's award, the Attentive Energy Two Project's investments in offshore wind facilities were expected to directly create hundreds of permanent jobs and support hundreds of additional jobs during the design, permitting, and construction phases of the Attentive Energy Two Project.

161. In addition, because so few leases currently exist in the New York Bight, the loss of any one lease—here, the Attentive Lease—increases the chance that NJBPU's future offshore wind solicitations will not be as competitive, increasing the price New Jersey must pay to procure offshore wind energy.

3. *New Jersey's Climate Goals and Environmental and Public Health Interests*

162. Finally, the Settlement Agreement and Lease cancellation will adversely affect New Jersey's ability to mitigate climate change and the health effects of fossil fuel-based energy.

163. New Jersey passed the Global Warming Response Act in 2007, which requires the State to achieve 80% reductions from 2006 greenhouse gas emissions by 2050. 2007 N.J. Laws ch. 112 § 2; N.J. Stat. Ann. § 26:2C-38. As the power generation sector is the sector that emits the second-largest volume of greenhouse gases, reducing those emissions is key to achieving these goals. Toward the same end, in 2010, the New Jersey Legislature enacted the Offshore Wind Economic Development Act, which authorized NJBPU to conduct competitive solicitations for offshore wind projects to receive offshore wind RECs in exchange for providing electricity to the New Jersey electric grid. The goal of these solicitations is to enable a percentage of New Jersey's electric load to be supplied by offshore wind energy, which in turn will reduce greenhouse gas emissions that would otherwise be generated from fossil fuel-based energy sources. An executive order established a goal of reaching 11 gigawatts of offshore wind by 2040. Exec. Order No. 307 (N.J. Governor Philip D. Murphy) (Sept. 21, 2022).

164. At the time of NJBPU's award, the Attentive Energy Two Project was expected to result in an average of 2.3 million tons of avoided greenhouse gas emissions annually. The loss of these expected reductions will impede New Jersey's ability to fulfill its statutory goals, thereby injuring its ability to implement its own laws and likely forcing the State to incur additional expenses to meet its emissions and renewable energy targets.

## C. Impacts on and Harm to the New England States: Connecticut, Maine, Massachusetts, Rhode Island, and Vermont

165. Cancellation of offshore wind leases, including the Attentive Lease, will also delay or altogether deprive the New England States of important reliability, affordability, clean energy, climate, and emission-reduction benefits. If the Lease cancellation is vacated, the Lease area can proceed toward development and provision of these important benefits to the States and their residents.

166. Similar to New York and New Jersey, the New England States' energy demand is projected to rise 9% over the next ten years. Offshore wind energy, including energy generated in the New York Bight, is critical to meeting this demand.

167. The New England States share a regional high-voltage electric grid and wholesale market for electricity, administered by the non-profit Independent System Operator New England (ISO-NE). ISO-NE is responsible for maintaining resource adequacy and planning for electric reliability, operating the high-voltage transmission system, and administering the competitive wholesale market for electricity.

168. New England regularly imports electricity from New York to serve the region's growing demand. From January to April 2026, New England imported 3,119 gigawatt-hours of electricity from New York. Factoring in exports from New England to New York, New England has relied on New York imports to serve about 7% of its energy load in the first few months of 2026. In 2025, New England imported 6,527 gigawatt-hours of electricity from New York.

169. Offshore wind generation that delivers into NYISO is slated to be a critical part of New York's future electricity supply, and the Settlement Agreement and Lease cancellation jeopardize New York's ability to secure adequate and reliable future energy supply. This constraint on new generation from offshore wind would negatively impact New England by constraining NYISO's ability to export power to ISO-NE, a crucial resource for New England electric reliability, especially during constrained winter periods.

170. The Lease cancellation will also increase energy prices for the New England States. BOEM established a finite number of offshore wind energy lease areas on the Atlantic Coast. Numerous Atlantic Coast States are interested in the development of offshore wind generation to meet energy reliability and emissions goals. For example, Connecticut's October 2021 Integrated Resources Plan identifies offshore wind energy development as a key strategy to achieving a reliable and affordable greenhouse gas emissions-free electricity supply by 2040, which is required under state law. Cancelling lease areas, including the Attentive Lease, will increase competition between interested States for access to a now-reduced supply of energy

produced by offshore wind projects from remaining lease areas. The resulting competition is likely to increase the cost of offshore wind energy for all States.

171. The New England States also stand to lose other benefits if the Lease cancellation and Settlement Agreement are not vacated.

172. Like many other states, the New England States expect increased load growth over the coming years. In Maine, for example, demand for electricity is projected to double by 2050. In addition, New England is on its way to becoming a winter-peaking electric system, meaning electricity demand will be highest in the colder months. Winter months are already the period when the electricity supply is most constrained in New England, since the region's natural gas infrastructure is running close to maximum capacity on the coldest days.

173. When power plants that are already running cannot generate sufficient electricity, more expensive and more polluting generators, including oil- and gas-burning facilities, are brought online to produce electricity, resulting in more harmful emissions for New England communities and higher prices for New England electricity ratepayers. States are themselves ratepayers; for example, the five-year average electricity consumption for Connecticut executive branch agencies between fiscal years 2019 and 2023 was over 270,000 kilowatt-hours.

174. Offshore wind generation can reduce the need for high-cost, high-emissions electricity generators in winter months. Offshore wind has its highest capacity factor—is able to generate the most energy—during the coldest months, when the generating system for electricity production in New England is most

54

strained. Since New England relies on imports from New York during winter months, increasing the supply of offshore wind in New York could help ensure New England is able to import sufficient capacity from New York to ensure winter reliability. Additionally, increasing the winter electric capacity in New York with offshore wind generation could help reduce the cost of the electricity imported to New England.

175.    Renewable energy generated in New England and New York also creates environmental attributes that are traded in regional marketplaces through RECs.

176.    For instance, wind energy projects and other eligible renewable energy projects in New York can qualify to generate Class I RECs under Massachusetts regulations. The electric distribution companies in Massachusetts purchase RECs to comply with the Commonwealth's Renewable Portfolio Standard, which requires obtaining specified percentages of electricity from renewable resources. In 2023, the most recent year for which data exists, Massachusetts settled, i.e., consumed, 1,739,531 MA Class I RECs from clean energy generators located in New York, of which the vast majority (nearly 1.3 million) were generated by wind resources.

177.    Rhode Island also has a Renewable Energy Standard, and in 2024, the most recent year for which data exists, 25.2% of RECs settled in Rhode Island were from clean energy generators located in New York. That is the next-highest percentage after RECs generated in Rhode Island. 90% of those, or 22.68% of Rhode Island's total settled RECs, were from wind energy generated in New York.

55

178.   Maine also has a Renewable Portfolio Standard, which requires that 80% of electricity be generated by renewable resources by the year 2030 and 100% clean energy by 2040. As a part of the Renewable Portfolio Standard program, electricity suppliers in Maine are required to purchase RECs. Connecticut's Renewable Portfolio Standard, meanwhile, has existed in some form since 1998, and also relies on the purchase of RECs.

179.   Offshore wind projects in New York would generate RECs for compliance with the New England States' renewable energy requirements. Without access to New York offshore wind leases, there will be fewer New York RECs available for purchase, creating tighter supply and higher prices in the regional REC marketplace. In other words, a smaller group of projects will be capable of generating RECs, increasing the market price of RECs, and thus increasing costs for already burdened New England ratepayers.

180.   Additionally, the foregone greenhouse gas emission reductions resulting from the Lease cancellation will exacerbate climate change and its resulting harms to the New England States.

181.   With 1,500 miles of coastline and 5.2 million people—73% of the Massachusetts population—residing in coastal communities, Massachusetts is particularly vulnerable to sea-level rise and increasingly frequent extreme weather events attributable to climate change. Over the twenty-first century, Massachusetts is projected to experience approximately 4.0 to 7.6 feet of sea-level rise, and estimates of coastal property damage for the Commonwealth are expected to reach over $1

billion per year by the 2070s. Flooding due to climate change will harm the approximately 177 Commonwealth-owned parks, beaches, reservations, wildlife refuges, roads, parkways, piers and dams and necessitate increasing expenditures to protect, repair, and rebuild the Commonwealth's properties. These expenditures are expected to increase to about $17 million annually in the 2030s.

182. Connecticut also feels the effects of climate change, including through flooding, extreme storms, property loss, and negative public health consequences.

183. The same can be said of Maine. Between March 2022 and May 2024, Maine experienced an extraordinary nine natural disasters, each severe enough to merit Presidential disaster or emergency declarations. With 3,500 miles of tidal coastline, Maine has the fourth-longest coast in the continental United States, and this coastline provides a vital economic function for the State. Rising sea levels and a rapidly warming Gulf of Maine caused by climate change threaten coastal communities and the marine resources they depend on. By 2050, sea level rise is forecasted to cause more than $2.1 billion in lost gross domestic product and the elimination of thousands of jobs in tourism, fishing, and real estate. In addition, as the most heavily forested state in the country, Maine is susceptible to long and frequent power outages caused by severe storms, floods, and other natural disasters. These challenges are heightened by the increased risk of severe and unpredictable weather as a result of climate change.

184. Rhode Island is similarly affected by climate change, including through rising average temperatures and sea levels, rising precipitation rates, and rising

coastal flooding events. The State's predisposition to flooding means that Rhode Island is also disproportionately impacted by rising sea levels. The average sea level in Newport has risen by about 0.12 inches each year since 1930—an increase of nearly one foot in a century. Climate change also threatens Rhode Island's coastal resources and ecosystems. The State's rivers, bays, and ocean waters will continue to warm, threatening vulnerable species and vital industries. Moreover, increased frequency of extreme heat events as a result of climate change will create public health risks and strain Rhode Island's healthcare resources.

185.    Thus, the Lease cancellation will inflict a range of harms on the New England States.

**FIRST CLAIM FOR RELIEF**
**(Against Interior Defendants)**

**<u>Administrative Procedure Act</u>**

**The Lease Cancellation Is Arbitrary and Capricious**
**in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A)**

186.    The States incorporate by reference the allegations in the preceding paragraphs.

187.    Under the APA, a court is required to "hold unlawful and set aside" final agency action that is "arbitrary" or "capricious." 5 U.S.C. § 706(2)(A).

188.    The Lease cancellation constitutes final agency action. *See* 5 U.S.C. § 704. Specifically, it "mark[s] the consummation of the agency's decisionmaking process" and is an action "from which legal consequences will flow." *Bennett v. Spear*, 520 U.S. 154, 177–78 (1997) (citation modified).

189.    The Lease cancellation is arbitrary and capricious because Interior Defendants failed to (1) provide a reasoned explanation for cancelling the Lease; (2) explain their change in position or account for New York and New Jersey's reliance interests; (3) address alternative means of achieving their objectives; or (4) provide a genuine justification for the Lease cancellation.

190.    *First*, an agency action is arbitrary or capricious where it is not "reasonable and reasonably explained." *FCC v. Prometheus Radio Project*, 592 U.S. 414, 423 (2021).

191.    When an agency action is based on purported concerns about national security, "APA review . . . involves more than a court rubberstamping action based on bare declarations from the agency amounting to 'trust us, we had good national security reasons for what we did.'" *Kirwa v. U.S. Dep't of Def.*, 285 F. Supp. 3d 257, 270 (D.D.C. 2018).

192.    The Lease cancellation is arbitrary and capricious because it lacks a reasoned explanation. Interior Defendants cited "classified national security concerns" as the justification for cancelling the Lease. Settlement Agreement at 2. But Interior Defendants did not specify what type of national security concerns the Lease implicated, nor did it explain why any concerns could not be adequately mitigated through BOEM's robust permitting process.

193.    Interior Defendants also asserted that, if Attentive were to continue developing the Lease, BOEM would have ordered it "to suspend construction and operations of this project indefinitely due to national security issues, similar to the

suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." *Id.* But Interior Defendants arbitrarily failed to take into account the fact that courts have preliminarily enjoined or stayed all five of the referenced suspension orders as not justified by imminent national security concerns.

194.   Furthermore, it is arbitrary and capricious for Interior Defendants to depart from their obligations under the Lease agreement without explanation. The terms of the Lease, as amended, provide that any cancellation "predicated on a threat of serious irreparable, or immediate harm or damage, or an imminent threat of serious or irreparable harm or damage, requires a finding by [BOEM] of particularized harm that it determines can only be feasibly averted by suspension of on-lease activities." Amended Lease at 4. Although Interior Defendants claim that they canceled the Lease for national security purposes, they have not made any finding of "particularized harm" or determined that such harm can only be averted by completely cancelling the Lease.

195.   *Second*, agencies may only change their existing policies if they "provide a reasoned explanation for the change, display awareness that they are changing position, and consider serious reliance interests." *FDA v. Wages & White Lion Invs., LLC*, 604 U.S. 542, 568 (2025) (citation modified).

196.   In 2022, after years of analysis, interagency consultation, and environmental review, BOEM held a competitive offshore wind auction, pursuant to which Attentive was awarded the Lease in the New York Bight. The sale and award of the Lease were based upon and supported by an extensive record.

197.   Interior Defendants failed to explain their change in position as to the purported national security concerns associated with offshore wind energy development in the New York Bight.

198.   Interior Defendants also failed to consider the significant reliance interests that New York and New Jersey have formed based on BOEM's award of the Lease. The APA requires an agency that is reversing a prior policy or decision "to assess whether there were reliance interests, determine whether they were significant, and weigh any such interests against competing policy concerns." *Dep't of Homeland Sec. v. Regents of the Univ. of Cal.*, 591 U.S. 1, 33 (2020).

199.   New York and New Jersey have relied on the development of the Lease area as a component of their long-term strategies to support grid reliability, energy diversification, and climate goals. In cancelling the Lease, Interior Defendants did not even acknowledge these reliance interests, rendering the cancellation arbitrary and capricious for that reason as well.

200.   *Third*, agencies are required to "address" alternative "way[s] of achieving [their] objectives" and give "adequate reasons" for abandoning those alternatives. *Motor Vehicle Mfrs. Ass'n of the U.S., Inc. v. State Farm Mut. Auto. Ins. Co.*, 463 U.S. 29, 48 (1983).

201.   BOEM offered the Lease area for sale after significant consultation with DOD and after determining that any potential wind energy projects could sufficiently mitigate national security concerns by adopting appropriate mitigation measures.

61

202.   Interior Defendants did not explain why the purported national security concerns that DOD purportedly identified required the Lease's complete cancellation and could not adequately be mitigated through site-specific measures, as previously contemplated by BOEM and DOD. Because Interior Defendants "too cavalierly sidestepped [their] responsibility to address reasonable alternatives, [their] action was not rational and must, therefore, be set aside." *Del. Dep't of Nat. Res. & Env't Control v. EPA*, 785 F.3d 1, 18 (D.C. Cir. 2015).

203.   *Fourth*, agencies are required to "offer genuine justifications for important decisions, reasons that can be scrutinized by courts and the interested public. Accepting contrived reasons would defeat the purpose of the enterprise." *Dep't of Com. v. New York*, 588 U.S. 752, 785 (2019).

204.   The purported national security concerns that Interior Defendants described are not a genuine justification for the Lease cancellation.

205.   Despite the 2005 amendments to OCSLA making the Outer Continental Shelf available for renewable energy production, including offshore wind, the Interior Secretary and President Trump have taken myriad actions to hinder wind energy development and made countless statements in public interviews and announcements opposing offshore wind energy for reasons that are unrelated to national security. These statements, and the many actions the Interior Secretary and President Trump have taken to stop the development of offshore wind energy, demonstrate that the Lease cancellation was based on political pressure and not any

consideration "made relevant by Congress" in OCSLA. *See D.C. Fed'n of Civic Ass'ns v. Volpe*, 459 F.2d 1231, 1246 (D.C. Cir. 1971).

206.    The rollout of the Lease cancellation and Settlement Agreement also demonstrates pretext. In its initial press release announcing the deal, Interior framed both actions as an attempt "to redirect capital from expensive, unreliable offshore wind leases toward affordable, reliable natural gas projects that will provide secure energy for hardworking Americans,"[40] indicating that national security concerns did not play a significant role in the Lease cancellation decision.

207.    Furthermore, Interior Defendants assert that the Lease cancellation resembles "the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." Settlement Agreement at 2. Those suspension orders, which were also premised on unspecified national security concerns, were all preliminarily enjoined or stayed well before the Settlement Agreement or Lease cancellation on the ground that they, too, were not justified by those concerns. *See* cases cited *supra* ¶ 99; Tr. of Prelim. Inj. Hr'g at 44:4–10, *Revolution Wind*, No. 25-cv-2999 (Jan. 12, 2026), ECF No. 65 (stating that the government's failure to explain the issuance of the suspension order "suggests that the stated national security reason may have been pretextual"). And as discussed above, BOEM did not review the classified information that purportedly justified the suspension orders until November 26, 2025, after it had already begun to strategize about a deal with TotalEnergies.

---

[40] Press Release, Interior, *supra* note 8.

208. The Lease cancellation is, therefore, arbitrary and capricious and should be vacated and set aside under the APA.

## SECOND CLAIM FOR RELIEF
### (Against Interior Defendants)

## Administrative Procedure Act

## The Lease Cancellation Is Not in Accordance with NEPA and Not in Observance of Procedure Required by NEPA in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (D)

209. The States incorporate by reference the allegations in the preceding paragraphs.

210. Under the APA, a court must "hold unlawful and set aside agency action, findings, and conclusions" that the court finds to be, among other things, "not in accordance with law" or "without observance of procedure required by law." 5 U.S.C. § 706(2)(A), (D).

211. NEPA requires federal agencies to prepare an environmental impact statement for any "major Federal action[] significantly affecting the quality of the human environment." 42 U.S.C. § 4332(C).

212. Agencies are required to take a hard look at the reasonably foreseeable social, economic, and environmental impacts of a proposed action and its alternatives. *See id.*; *Balt. Gas & Elec. Co. v. NRDC*, 462 U.S. 87, 93, 97 (1983).

213. Agencies are also required to consider alternatives to taking a proposed action, *see* 42 U.S.C. § 4332(C)(iii), (F), (H), and to identify measures that might mitigate adverse environmental impacts and incorporate measures necessary to

mitigate adverse impacts, *see Theodore Roosevelt Conserv. P'ship v. Salazar*, 616 F.3d 497, 503 (D.C. Cir. 2010).

214.    To determine whether a major federal action will have a significant effect on "the quality of the human environment," agencies shall, with limited exceptions, prepare an environmental assessment. *See* 42 U.S.C. § 4336(b)(2).

215.    If an agency determines that the proposed action will not have any significant effect, accounting for mitigation, it can issue a finding of no significant impact. *Id.* If the environmental assessment reveals that there may be significant effects, an environmental impact statement is required. *Id.* § 4336(b)(1).

216.    Either level of review requires public participation opportunities and consideration of alternatives to the proposed action. *Id.* § 4332(C)(iii), (F), (H).

217.    Interior Defendants' cancellation of the Lease constitutes a major federal action within the meaning of NEPA. *Id.* §§ 4332(C), 4336e(10).

218.    Interior Defendants did not prepare an environmental assessment and finding of no significant impact, an environmental impact statement, or a record of decision regarding the Lease cancellation, nor did they otherwise conduct any NEPA review of the Lease cancellation or take a hard look at the reasonably foreseeable social, economic, and environmental impacts of the Lease cancellation and its alternatives.

219.    Interior Defendants did not provide the public an opportunity to participate in a NEPA review of their decision to cancel the Lease.

220.    As a result of their failure to conduct the required NEPA review, Interior Defendants failed to consider the full extent of the reasonably foreseeable impacts to the States of the Lease cancellation, including adverse impacts to grid reliability, energy diversification, and other environmental benefits that would accrue to the States if the Lease area were developed.

221.    Interior Defendants also failed to consider alternatives to the Lease cancellation, including any mitigation measures.

222.    The Lease cancellation is, therefore, not in accordance with law and not in observance of procedure required by NEPA and should be vacated and set aside under the APA.

## THIRD CLAIM FOR RELIEF
### (Against Interior Defendants)

### Administrative Procedure Act and Outer Continental Shelf Lands Act

**The Lease Cancellation Is Not in Accordance with OCSLA
and Not in Observance of Procedure Required by OCSLA
in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(A), (D), and
OCSLA, 43 U.S.C. § 1349(a)(1)**

223.    The States incorporate by reference the allegations in the preceding paragraphs.

224.    Under the APA, a court is required to "hold unlawful and set aside" final agency action that is "not in accordance with law" and that is "without observance of procedure required by law." 5 U.S.C. § 706(2)(A),(D).

225.    OCSLA's citizen suit provision provides that "any person having a valid legal interest which is or may be adversely affected may commence a civil action on

66

his own behalf to compel compliance with this subchapter against any person, including the United States, and any other government instrumentality or agency (to the extent permitted by the eleventh amendment to the Constitution) for any alleged violation of any provision of this subchapter or any regulation promulgated under this subchapter, or of the terms of any permit or lease issued by the [Interior] Secretary under this subchapter." 43 U.S.C. § 1349(a)(1).

226. The Lease cancellation violates OCSLA within the meaning of 43 U.S.C. § 1349(a)(1) and is not in accordance with OCSLA or the procedure required by OCSLA within the meaning of the APA because Interior Defendants (1) did not hold a hearing before cancelling the Lease or make the required determination that cancellation was required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) did not suspend the Lease for a period of five years prior to cancellation, in violation of 43 U.S.C. § 1334(a)(2)(B); (3) paid Attentive more than the fair market value of the Lease at the time of cancellation, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (4) did not consider the factors they were required to consider under 43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102, or otherwise demonstrate grounds for departure from regulations pursuant to 30 C.F.R. § 585.103; and (5) did not notify or coordinate with the Governors of the affected States, in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

227. *First*, OCSLA specifies that a lease shall not be canceled unless the Interior Secretary determines, "after a hearing," that (i) "continued activity pursuant to such lease would probably cause serious harm or damage to life . . . , to property,

to any mineral . . . , to the national security or defense," or "to the marine, coastal, or human environment;" (ii) "the threat of harm or damage will not disappear or decrease to an acceptable extent within a reasonable period of time;" and (iii) "the advantages of cancellation outweigh the advantages of continuing such lease." 43 U.S.C. § 1334(a)(2)(A).

228.    Interior Defendants did not hold a hearing before cancelling the Lease, nor did they find that continued activity pursuant to the Lease would probably cause serious harm to national security or defense or that the purported harm would not lessen to an acceptable extent within a reasonable period of time.

229.    *Second,* OCSLA provides that a lease cannot not be canceled "unless and until" the lease has been suspended for a period of five years, with a corresponding extension of the expiration of the lease period. *Id.* § 1334(a)(2)(B). Importantly, while OCSLA permits a lessee to request a "lesser period" of suspension than five years, it does not permit Interior Defendants to ignore this requirement altogether, as they have done here. *Id.*

230.    *Third,* OCSLA's compensation formula provides that, in the event of a lease cancellation, a lessee shall not be paid more than the fair market value of the lease at the time of the cancellation. *Id.* § 1334(a)(2)(C). It does not permit the federal government to simply refund the initial lease payment at the original purchase price. At the time of the Lease cancellation, the fair market value of the Lease was significantly less than the original purchase price, as demonstrated by the numerous impairments taken by offshore wind developers, including TotalEnergies, over the

past 18 months. Therefore, Interior Defendants violated OCSLA by failing to follow the compensation formula.

231. *Fourth,* OCSLA requires the Interior Secretary to "ensure" that any activity carried out pursuant to Interior's renewable energy leasing authority "is carried out in a manner that provides for" a set of twelve enumerated factors, which include "prevention of waste" and "fair return to the United States for any lease." *Id.* 1337(p)(4). Similarly, BOEM's regulations require BOEM to "ensure" that renewable energy activities carried out on the Outer Continental Shelf are done "in a manner that provides for and reaches a rational balance among" the twelve statutory factors, "none of which inherently outweighs or supplants any other." 30 C.F.R. § 585.102(a).

232. Interior Defendants canceled the Lease without adequately considering the twelve factors they were required to "rational[ly] balance." For example, Interior Defendants did not evaluate whether the Lease cancellation, for which Interior Defendants requested $795 million—the full purchase price of the lease—from the Judgment Fund, "[p]revent[ed] . . . waste, including economic waste," "protect[ed] . . . the rights of other authorized users of the [Outer Continental Shelf]," or ensured "[a] fair return to the United States." *Id.*; *see also* 43 U.S.C. § 1337(p)(4). Interior Defendants likewise failed to establish that any departure from regulations was warranted pursuant to 30 C.F.R. § 585.103.

233. *Fifth*, OCSLA requires the Interior Secretary to "notify the Governor of any . . . State" affected by "any action" taken by a federal agency "which has a direct

69

and significant effect on the outer Continental Shelf or its development," 43 U.S.C. § 1334(h), and to "provide for coordination and consultation with the Governor of any State . . . that may be affected by a lease" under OCSLA's offshore wind leasing provision, *id.* § 1337(p)(7).

234.    The States will, as described above, be affected by the Lease cancellation. But Interior Defendants failed to coordinate or consult with any of the affected States' Governors.

235.    The Lease cancellation is, therefore, not in accordance with law and not in observance of procedure required by law and should be vacated and set aside under the APA.

236.    Pursuant to 43 U.S.C. § 1349(a)(2)(A), on June 3, 2026, the States provided notice to Interior Defendants of these violations of OCSLA.

237.    Accordingly, in addition to granting relief under the APA, the Court should compel compliance with OCSLA by vacating the Lease cancellation pursuant to 42 U.S.C. § 1349(a)(1).

**FOURTH CLAIM FOR RELIEF**
**(Against Federal Defendants)**

**Administrative Procedure Act and Outer Continental Shelf Lands Act**

**The Settlement Agreement Is Not in Accordance with OCSLA or the Judgment Fund Act and Is in Excess of Statutory Authority in Violation of the Administrative Procedure Act, 5 U.S.C. § 706(2)(A), (C), and OCSLA, 43 U.S.C. § 1349(a)(1)**

238.    The States incorporate by reference the allegations in the preceding paragraphs.

239. Under the APA, a reviewing court must set aside a challenged agency action that is found to be "not in accordance with law" or "in excess of statutory jurisdiction, authority, or limitations, or short of statutory right." 5 U.S.C. § 706(2)(A),(C).

240. The Settlement Agreement constitutes final agency action reviewable under the APA. *See* 5 U.S.C. § 704; *Bennett*, 520 U.S. at 177–78; *see also Exec. Bus. Media, Inc. v. U.S. Dep't of Def.*, 3 F.3d 759, 762 (4th Cir. 1993); *United States v. Carpenter*, 526 F.3d 1237, 1242 (9th Cir. 2008).

241. An agency may not "circumvent[] federal law by entering into [a] settlement agreement." *Carpenter*, 526 F.3d at 1242.

242. The Settlement Agreement is not in accordance with OCSLA or the Judgment Fund Act and is in excess of statutory authority within the meaning of the APA, 5 U.S.C. § 706(2)(A), (C), and it constitutes a violation of OCSLA within the meaning of OCSLA's citizen suit provision, 43 U.S.C. § 1349(a)(1).

243. As explained in ¶¶ 226–34 above, the Lease cancellation is not in accordance with OCSLA because Interior Defendants (1) did not hold a hearing before cancelling the Lease or make the required determination that cancellation was required by national security or defense, in violation of 43 U.S.C. § 1334(a)(2)(A); (2) did not suspend the Lease for a period of five years prior to cancellation, in violation of 43 U.S.C. § 1334(a)(2)(B); (3) paid Attentive more than the fair market value of the Lease, in violation of the compensation formula mandated by 43 U.S.C. § 1334(a)(2)(C); (4) did not consider the factors they were required to consider under

71

43 U.S.C. § 1337(p)(4) and 30 C.F.R. § 585.102 or otherwise demonstrate grounds for departure from regulations pursuant to 30 C.F.R. § 585.103; and (5) did not notify or coordinate with the Governors of the affected States, in violation of 43 U.S.C. § 1334(h) and § 1337(p)(7).

244.    Because the terms of the Settlement Agreement ordered the unlawful Lease cancellation, and because the Settlement Agreement itself provides for a monetary settlement that exceeds the maximum payment for lease cancellations authorized by OCSLA's compensation formula, 43 U.S.C. § 1334(a)(2)(C), the Settlement Agreement also violates OCSLA and is not in accordance with the law within the meaning of the APA. *See Exec Bus. Media*, 3 F.3d at 762 (explaining that the Attorney General's "plenary power [to settle claims] means absolute authority to pursue legitimate objectives and does not include license to agree to settlement terms that would violate the civil laws governing the agency").

245.    The Settlement Agreement also violates the Judgment Fund Act's requirement that a payment be made under the Act only if (1) the payment is not otherwise provided for, 31 U.S.C. § 1304(a)(1), and (2) the settlement is payable under 28 U.S.C. § 2414, 31 U.S.C. § 1304(a)(3)(A).

246.    First, leaving aside the fact that the Lease cancellation was unlawful, payment of compensation for lease cancellation is already provided for under OCSLA, 43 U.S.C. § 1334(a)(2)(C), as well as under the Lease agreement. Because OSCSLA and the Lease agreement provided for payment, the Judgment Fund may not be utilized to compensate Attentive for the Lease cancellation.

247.    Second, pursuant to 28 U.S.C. § 2414, compromise settlements may only be entered into for "claims referred to the Attorney General for defense of imminent litigation." Here, there was no imminent litigation, nor any referral to the Attorney General or substantive engagement by DOJ.

248.    The Settlement Agreement states that BOEM would have issued a suspension order to Attentive "due to national security issues, similar to the suspension order issued by BOEM to five other offshore wind projects on December 22, 2025." Settlement Agreement at 2. It further states that "Attentive would have claimed breach of contract in the event that such a suspension order was received." *Id*. Even if a breach-of-contract lawsuit instead of an APA action were the proper vehicle for judicial review of a suspension order, no breach-of-contract lawsuit by Attentive was imminent. To the contrary, both sides wanted to cancel the Lease, and both sides wanted federal funds to be directed to TotalEnergies for purposes of oil and gas development. TotalEnergies first approached Interior with the idea of receiving payment for cancelling the Lease. As TotalEnergies' chief executive officer said, "It came from us—we took the initiative."[41]

249.    Furthermore, a hypothetical lawsuit to challenge an agency action that had not even been threatened—here, the suspension or cancellation of the Lease—does not constitute actual or imminent litigation under the Judgment Fund Act. *See* Gov't Accountability Off., *supra* note 10, at 14-34 to -35.

250.    The Settlement Agreement is also in excess of statutory authority.

---

[41] Harder, *supra* note 38.

73

251.    No act of Congress authorizes Interior or DOJ to cancel an offshore wind lease on grounds unrelated to OCSLA.

252.    No act of Congress authorizes Interior or DOJ to pay the holder of an offshore wind lease the full purchase price of the lease in exchange for the lease's cancellation. *Cf.* 43 U.S.C. § 1334(a)(2)(C) (OCSLA's compensation formula for lease cancellations).

253.    No act of Congress authorizes Federal Defendants to require the holder of an offshore wind lease to agree, in exchange for receiving a payment equivalent to the full purchase price of the lease, to invest that money, or the same amount of money, in unrelated activities, essentially redirecting money from one authorized use—offshore wind leasing—to a separate, unauthorized use favored by the President—oil and gas production.

254.    The Settlement Agreement is, therefore, not in accordance with OCSLA or the Judgment Fund Act and is in excess of statutory authority and should be vacated and set aside under the APA.

255.    Pursuant to 43 U.S.C. § 1349(a)(2)(A), on June 3, 2026, the States provided notice to Federal Defendants of this violation of OCSLA.

256.   Accordingly, in addition to granting relief under the APA, the Court should compel compliance with OCSLA by vacating the Lease cancellation pursuant to 42 U.S.C. § 1349(a)(1).

### FIFTH CLAIM FOR RELIEF
### (Against Federal Defendants)

### *Ultra Vires* Doctrine

### The Settlement Agreement Is *Ultra Vires*

257.   The States incorporate by reference the allegations in the preceding paragraphs.

258.   As explained in ¶¶ 250–53 above, no statute authorized the adoption or implementation of the Settlement Agreement.

259.   The Settlement Agreement is, therefore, *ultra vires* and should be declared unlawful and vacated.

### PRAYER FOR RELIEF

The States respectfully request that this Court enter judgment:

1.   Declaring that the Lease cancellation is arbitrary and capricious, not in accordance with law, and not in observance of procedure required by law and that the Settlement Agreement is not in accordance with law, in excess of statutory authority, and *ultra vires*;

2.   Compelling compliance with OCSLA;

3.   Vacating the Lease cancellation and Settlement Agreement;

4.   Temporarily, preliminarily, and permanently enjoining Federal Defendants from implementing the Lease cancellation and Settlement Agreement; and

5.   Granting such further relief as the Court deems just and proper, including, but not limited to, attorneys' fees and costs.

Dated:   New York, New York
        August 14, 2026


FOR THE STATE OF NEW YORK

LETITIA JAMES
Attorney General of New York

/s/ *Matthew Eisenson*
Monica Wagner
   *Deputy Bureau Chief*
Laura Mirman-Heslin
Matthew Eisenson
   *Assistant Attorneys General*
Libby Dimenstein
   *Special Assistant Attorney General*
Environmental Protection Bureau
28 Liberty Street
New York, NY 10005
(212) 416-6351
Monica.Wagner@ag.ny.gov


Morgan Costello
   *Deputy Bureau Chief*
Environmental Protection Bureau
The Capitol
Albany, NY 12224


FOR THE STATE OF NEW JERSEY

JENNIFER DAVENPORT
Attorney General of New Jersey

/s/ *Rachel Manning*
Jessica Palmer
   *Assistant Attorney General*
Rachel Manning
   *Deputy Attorney General*
New Jersey Division of Law
25 Market Street, P.O. Box 093
Trenton, NJ 08625
(609) 376-2740
Jessica.Palmer@law.njoag.gov
Rachel.Manning@law.njoag.gov


FOR THE STATE OF CONNECTICUT

WILLIAM TONG
Attorney General of Connecticut

/s/ *Matthew I. Levine*
Matthew I. Levine (D.C. Bar No. 230278)
   *Deputy Associate Attorney General*
165 Capitol Ave
Hartford, CT 06106
(860) 808-5250
matthew.levine@ct.gov


FOR THE STATE OF MAINE

AARON M. FREY
Attorney General of Maine

/s/ *Caleb Elwell*
Caleb E. Elwell
   *Assistant Attorney General*
Office of the Maine Attorney General
6 State House Station
Augusta, ME 04333
(207) 626-8545
Caleb.Elwell@Maine.gov

76

FOR THE COMMONWEALTH OF
MASSACHUSETTS

ANDREA JOY CAMPBELL
Attorney General of Massachusetts

/s/ *Turner Smith*
Turner Smith
  *Deputy Chief & Assistant Attorney*
  *General*
Nathaniel Haviland-Markowitz
  *Assistant Attorney General*
Jon Whitney
  *Special Assistant Attorney General*
Energy and Environment Bureau
Office of the Attorney General
One Ashburton Place
Boston, MA 02108
(617) 727-2200
Turner.Smith@mass.gov

FOR THE STATE OF VERMONT

CHARITY R. CLARK
Attorney General of Vermont

/s/ *Hannah Yindra*
Hanna Yindra
  *Assistant Attorney General*
Office of the Attorney General
109 State Street
Montpelier, VT 05609
(802) 828-3186
Hannah.Yindra@vermont.gov

FOR THE STATE OF RHODE ISLAND

PETER F. NERONHA
Attorney General of Rhode Island

/s/ *Nicholas M. Vaz*
Sarah W. Rice
  *Deputy Chief,*
  *Public Protection Bureau*
Nicholas M. Vaz
  *Unit Chief, Environment and Energy*
Assistant Attorneys General
Rhode Island Office of the Attorney
General
150 South Main Street
Providence, RI 02903
(401) 274-4400
nvaz@riag.ri.gov
srice@riag.ri.gov